## JOHN COCKRUM v. THE STATE.

The discretion given to the jury, by Article 74 of the Penal Code, to direct, when the penalty affixed is imprisonment in the penitentiary for life, that the confinement may be solitary, or in whole, or in part, to labor, is not in conflict with Article 612, as originally adopted, which provided that murder might "be punished by death, solitary confinement in the penitentiary for life, confinement to labor for a term of years, not less," &c.

Article 612 was so shaped, to define the extent of the power of the jury, when they should determine to adopt either one of the three modes of punishing murder.

*Solitary* confinement for life, is not mentioned in the Code, as a specific class of punishment, but it is included under a part of the second divison into which punishments are classified, viz., " 2d, imprisonment in the penitentiary for life, or for a period of time."

And the jury may, in view of "the degree of atrocity, or circumstances of extenuation," of the case, increase the rigor of the confinement for life, by making it, in whole or in part, solitary.

Such construction should be given to the different articles of the Code, as accords with its general objects and purpose, and which will give full effect to all its provisions, general as well as special, so that they may stand and operate in harmony, though a "special provision" may thereby be partially controlled, where otherwise a general one could have no effect.

A charge is erroneous, which does not leave to the jury the discretion, when they affix the penalty of imprisonment in the penitentiary for life, to direct whether it should be solitary, or in whole, or in part, to labor.

The legislature is not constrained to affix the penalty of offences that are committed, with a view of the evil intent manifested in their commission, without regard to the means that may be used to carry the intent into effect.

The article of the Code, which provides that a homicide, which would otherwise be a case of manslaughter, if committed with a bowie knife or dagger, shall be deemed murder, and punished as such, is not in violation of the constitutional right of every citizen to bear arms in the lawful defence of himself or the State; but is in restraint of an abuse growing out of such right.

But the legislature could not affix such a punishment to the abuse, as, in its nature, must deter the citizen from its lawful exercise; for that would be tantamount to its prohibition.

The legislature may put all cases of manslaughter with deadly weapons, upon the same footing with murder, and leave the jury to affix the degree of punishment, according to their opinion of its atrocity.

The amendment to the Code, establishing degrees in murder, and affixing its

Cockrum v. The State.

punishment accordingly, limits the discretion of the jury, and is more often prejudicial than beneficial to a defendant; the court cannot, therefore, say that the punishment has been ameliorated by the amendments.

That a witness was permitted to state, that the ill-feeling which, on cross-examination, he had admitted he entertained towards the defendant, was caused by a report, charging him with horse-stealing, is immaterial, when this report had been previously stated, in detailing the quarrel that resulted in the homicide.

APPEAL from Freestone. Tried below before the Hon. John Gregg.

The appellant was indicted at the Fall Term, 1857, of the District Court of Freestone county, for the murder of William N. Self.

At the Fall Term, 1858, of the said court, a trial was had upon the indictment, and the following verdict was found by the jury, viz: " We, the jury, find the defendant guilty of murder according to the indictment, assessing the punishment at solitary confinement in the penitentiary, for life."

The defendant moved for a new trial, which was overruled, and he appealed. The questions discussed in the opinion will be fully understood, without a further statement of the case.

*Robert S. Gould*, for the appellant.—It is contended, that Article 610 of the Penal Code, is in violation both of the State and Federal Constitution, which contain substantially the same provision, securing the citizen from any infringement on the right to keep and bear arms. 1st. It is asserted, that any law prohibiting a citizen from keeping or bearing any knife, which is intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket-knife, would be unconstitutional. To prohibit absolutely the keeping and having of an ordinary weapon, is certainly to infringe on the right of keeping and bearing arms. A bowie-knife, or dagger, as defined in the Code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes

within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.

It has been held, that even a law prohibiting the carrying of concealed weapons, is unconstitutional. (Bliss v. Commonwealth, 2 Littell, 90.) The court there say, that whatever restrains the *full and complete exercise of the right*, is in violation of the Constitution. Such laws have, however, been sustained in other states. (See State v. Reid, 1 Ala. Rep. 612; State v. Mitchell, 3 Blackford, 229; Nunn v. State, 1 Kelly, 243.) The attention of the court is particularly called to the case of Nunn v. State, as bearing more directly on the proposition above asserted. The legislature of Georgia had passed a law, prohibiting the keeping, sale, or carrying of certain kind of knives or pistols. Judge LUMPKIN held it to be unconstitutional, in so far as it prohibited the carrying of a pistol, (or other weapon,) *openly*. It is held, also, in that case, that the provision in the Constitution of the United States, is applicable to state legislation.

2d. If the last proposition be conceded, it follows, that it is equally unconstitutional to prohibit the use of such a weapon in a proper case. The right to keep and bear, implies the right, on a proper emergency, to use. In the case of State v. Reid, 1 Ala. Rep. 612, (above cited,) it is said, that a statute requiring arms to be worn in such a manner as to render them wholly useless for the purpose of self-defence, would be clearly unconstitutional. Were the legislature to pass a law, inflicting a penalty for the use of a bowie-knife or dagger, in self-defence, it is believed that it would be unconstitutional, because of its infringement on the right to keep and bear arms, and on the inalienable right of self-defence.

3d. It is contended, that Article 610 of the Penal Code, is an attempt, indirectly, to prohibit the keeping, bearing, or use of a bowie-knife, or dagger, and is, therefore, unconstitutional. What other object could the law have in view, but to prohibit this weapon? Upon what other principle can its enactment be

justified, than that the use of a bowie-knife is in itself wrong, and that it is a weapon to be prohibited? What is it, in effect, but an effort, indirectly, to prohibit the keeping, bearing, or use of such knives? It is believed, that there is no difference in principle, between a law, making the use of a bowie-knife criminal, and a law *discriminating* against the use of a bowie-knife, by affixing a higher penalty to its use, than to the same act committed with any other deadly weapon. Substantially, this is to affix a penalty to the use of that weapon. This discrimination is but a form of prohibition. The right to discriminate against, implies the right to prohibit. Both rights are based on the unconstitutional ground, that the legislature can control the keeping, bearing, and use of this weapon. But the legislature cannot do indirectly, that which it has no power to do directly. (See Thomas v. State, 9 Texas Rep. 324.)

It is contended, that the amendment of Article 612 of the Penal Code, is an amelioration of the punishment of murder; and that the defendant should have been put on his election, as to which penalty he would receive. (Penal Code, Art. 14.) To ameliorate, is to "make better," to "improve;" to mitigate, is to "render less rigorous," to "diminish," to "reduce the amount or severity of;" and it is clear that these words are used in the same sense in the Code. The term murder, in the Code, and in the amended Code, embraces all the grades of murder. If the punishment of any of the grades of murder is mitigated by the amendment, the court should have given the defendant the benefit of the mitigation, unless he elected differently. Now, it is evident, that solitary confinement is a more rigorous punishment than confinement to labor. That it is so regarded by the law, is evident from the place assigned it in the scale of punishments. The amended Code has obliterated this odious penalty from our statute books, and thereby increased the possibilities of diminished punishment, and reduced the amount or severity of the punishment for any but the highest grade of murder. Surely, a punishment is mitigated, when one species of punishment is wholly abolished. Had the legislature diminished the

minimum or maximum punishment, it would hardly be denied to be a mitigation. Or, had the amendment left the law on the subject just as it was, only reducing the maximum of solitary confinement to a period of ten years, it would clearly have mitigated the punishment, by reducing its amount.

*Attorney-General,* for the appellee.

ROBERTS, J.—The defendant was convicted of murder, and sentenced to solitary confinement, for life, in the penitentiary. The matters of error complained of, arise upon the charge and rulings of the court below. The offence was laid in the indictment, and proved on the trial, to have taken place after the Code went into operation, and before the passage of the amendments to the Code.

There is no evidence in the record, that the court put the defendant upon his election, whether he would be tried under the provisions of the Code, as they originally stood, or under the amendments to the Code. But the charge was evidently based on the Code, as it was at the time the offence was committed.

In reference to the punishment, the court instructed the jury, that in the event they found the defendant guilty of murder, "they will say so, and assess the punishment at 'death,' or at 'solitary confinement in the penitentiary for life,' or at 'confinement in the penitentiary, to labor, for a term not less than three, nor more than fifteen years.' " This was intended to be in accordance with Article 612 of the Code, as originally passed, without taking into consideration the 74th article, which reads as follows, to wit : " In cases where the penalty affixed, is imprisonment in the penitentiary for life, the jury may, in their discretion, direct that the confinement be solitary, or that the whole, or any portion of it, be to labor."

The charge, as given by the court, did not leave to the jury the exercise of the discretion, as contemplated in this last article. And therefore if they believed the enormity of the offence required imprisonment for life, they were compelled to make it

Cockrum v. The State.

*solitary* confinement.  The court's attention was called to this error, by the grounds set out in the motion for a new trial, and for this error in the charge, a new trial should have been granted.

The article last referred to, is one of the general provisions relating to "punishments."  (Title 11, "Of Punishments in General.")  The rule of construction laid down is, that "each general provision shall be controlled by a special provision on the same subject, if there be a conflict."  (Art. 5, Penal Code.)

Article 74, giving the jury a discretion as to imposing solitary confinement in certain cases, is not *in conflict* with Article 612, which says, that murder "*may*," (not *shall*,) "be punished by death, solitary confinement in the penitentiary for life, confinement to labor for a term of years, not less than three, nor more than fifteen."  This article is so shaped, as to define the extent of the power of the jury, when they should determine to adopt either one of the three modes of punishing murder.  They had the *power* to determine that he should be punished by *solitary* confinement for life.  If they imprisoned him for life, were they compelled by the law to make the confinement solitary?  In treating "of punishments in general," it is said, "the punishments incurred for offences under this Code, are, first, death; second, imprisonment in the penitentiary for life, or for a period of time; third, imprisonment in the county jail; fourth, forfeiture of civil or political rights, or suspension from such rights for a limited time; fifth, pecuniary fines."

This does not mention *solitary* confinement for life as a specific class of punishment, but it is included under a part of the second head enumerated, of "imprisonment for life."  To make the confinement for life solitary, is one mode of increasing the punishment.  It is generally believed, considering our climate, and the active habits of our population, to be, in most cases, a slow mode of capital punishment.  The test furnished the jury as to the appropriate punishment of murder, is "the degree of atrocity, or circumstances of extenuation in each particular case."  (Art. 612.)  In applying this test, the jury might increase the rigor of the confinement for life, by making it in whole, or in part, solitary, and

this would not be in conflict with the power specially given them, to punish "by solitary confinement for life." If Article 74 is not thus made to harmonize, and partially control a "special provision," it can have no operation at all. From its very terms, it is designed to control just such a provision as this now under consideration, and to give the jury the discretion to modify the punishment, to suit their opinion of the enormity of the offence.

This is rendered still more obvious, by considering the general object of the Code, in establishing gradations in the punishment of murder. If the jury should believe the offence committed was not of the most heinous character, and that the defendant might be reformed, the measure of punishment is designated, and limited to labor in the penitentiary from three to fifteen years. If they should believe the offence so atrocious, that the defendant should never again be trusted in society, and that reformation for such purpose was not to be hoped for, then they were given the power to adapt the degree of punishment to the atrocity of the offence, by confinement to labor for life, by confinement for life, partly to labor and partly solitary, by solitary confinement for life, and by death. This view of the case, gives full effect to all the provisions of the Code, general as well as special (Art. 74 and 612;) allows them to stand and operate in harmony together, and gives to the jury a wide and varied range, in which to adapt the degree of punishment to the degree of atrocity manifested in the commission of the offence.

This view also comports with what is declared in the Code, that "the object of punishment is to suppress crime and reform the offender," (Penal Code, Art. 2,) and is arrived at in accordance with the rule prescribed, "that the provisions of this Code shall be liberally construed, so as to attain the objects intended by the legislature; the prevention, suppression and punishment of crime." (Art. 25.) The restriction upon this discretion of the jury, to impose solitary confinement in whole or in part, is found in the article conferring it, which makes it apply only " in cases where the penalty affixed is imprisonment in the penitentiary for life." (Art. 74.)

As the case will be remanded for this error, it is important to notice some other grounds of error assigned, because the same questions will necessarily arise upon another trial.

After charging the law generally upon the subject of manslaughter, the court below added, that, " if, however, the jury believe that the defendant is guilty of manslaughter, as above defined, but that the act was done with a bowie-knife, or dagger, they will consider the act murder." This was given in compliance substantially with Article 610 of the Code: "If any person be killed with a *bowie-knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly."

It is contended, that this article of the Code, is in violation of the Constitution of the United States, and of this State. The clause in the Constitution of the United States, that it is said to be in violation of, is the 2d Article of the Amendments: " A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." (O. & W. Dig. 7.) The clause in the Constitution of this State, which it is said to violate, is the 13th section of the Bill of Rights: " Every citizen shall have the right to keep and bear arms, in the lawful defence of himself or the State." (O. & W. Dig. 14.)

The object of the clause first cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed. The clause cited in our Bill of Rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen. The right of a citizen to bear arms, in the lawful defence of himself or the State, is absolute. He does not derive it from the State government, but directly from the sovereign convention of the people that framed the State government. It is one of the " high powers" delegated directly to the citizen, and " is excepted out of the general powers of government." A law cannot be passed

to infringe upon or impair it, because it is above the law, and independent of the law-making power.

The argument advanced against the constitutionality of this law is, that any discrimination made by the legislature, in punishing the abuse of this right, in regard to a particular weapon, is an impairing of the right of its lawful use. That proposition given a practical application, amounts to this, that the legislature cannot affix any higher punishment to an unlawful assault with one of the dangerous weapons, which it is lawful to carry, than with any other; because the effect of such discrimination against the unlawful use of such weapon would discourage the lawful use of it, and therefore the carrying of it. This proposition can hardly be maintained; for admitting that two persons make each an assault with like vicious intent, though with different weapons, one with a weapon not likely to produce death, but which is capable of it, and sometimes does it; and the other with a weapon so destructive in its character as to be almost certain to produce death, when used offensively; the act of the one, who has the more dangerous instrument, is much more likely to be seriously injurious to other people, than the act of the other, though the intent is the same in doing the acts. Now if the legislature can make no distinction in the punishment of the two cases supposed, it is forced to base its punishment upon the degree of evil intent, in total disregard of the means used to carry out that intent, and of the probable injurious results of the acts.

The right to carry a bowie-knife for lawful defence is secured, and must be admitted. It is an exceedingly destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost cer-

tain death. He who carries such a weapon, for lawful defence, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon. Now, is the legislature powerless to protect the rights of others thus the more endangered, by super-inducing caution against yielding to such frailties? May the State not say, through its law, to the citizen, "this right which you exercise, is very liable to be dangerous to the rights of others, you must school your mind to forbear the abuse of your right, by yielding to sudden passion; to secure this necessary schooling of your mind, an increased penalty must be affixed to the abuse of this right, so dangerous to others." This would be in accordance with the well established maxim of law, that "you must so use your own as not to injure others." A law inflict-ing such increased penalty, would only be a sanction of this rule.

Such admonitory regulation of the abuse must not be carried too far. It certainly has a limit. For if the legislature were to affix a punishment to the abuse of this right, so great, as in its nature, it must deter the citizen from its lawful exercise, that would be tantamount to a prohibition of the right. In the ab-sence of authority bearing on the question, we are not now pre-pared to say, that this law is one of such a nature, or that such has been, or will be, its practical effect. This is a question of power, not of policy. The legislature has the power to put all cases of manslaughter, committed with deadly weapons, on the same foot-ing with murder, in the punishment, leaving it to the jury to affix the degree of punishment, according to their opinion of the de-gree of its atrocity. If so, it is difficult to see the reason why they may not do this, in the case of a bowie-knife, the most deadly of all weapons in common use.

Another objection taken to the action of the court, is, that the defendant was not put upon his election, as to whether he would be tried under the Code, or under the amendments. This is neces-sary only, when "the punishment of the offence is ameliorated" by the last law. The maximum of punishment, both of murder and of manslaughter, is the same under both laws, and the minimum

in both, is increased by the last law. The main difference, otherwise, is the establishment of degrees in murder, and its punishment accordingly. This limits the discretion of the jury, and would more often be prejudicial to a defendant, than beneficial. We cannot say, then, that the punishment has been "ameliorated," in reference to the interests of a defendant by the last law.

Another objection is made to the ruling of the court, in the admission of testimony of a witness, who stated that his ill-feeling towards the prisoner, was caused by a report, charging him with horse-stealing, and of his having been run off from Hill county by the citizens. We do not think this could have been material. For this report about horse-stealing was detailed by the witnesses, as constituting the matter of quarrel, which resulted in the killing, and was a part of the evidence necessarily developed on the trial.

We are of opinion that the court erred upon the point first noticed, and for that reason the judgment must be reversed and the cause remanded.

Reversed and remanded.