Nelson, J.,
delivered the following opinion:
Concurring, as I do, in much of the reasoning of the majority of the Court, and believing that the object of the Legislature, in passing the act of 1870, was to promote the public peace, I am, nevertheless, constrained by a sense of duty to observe, that, in my opinion, that statute is in violation of one -of the most sacred rights known to the Constitution. Ever since the opinions were promulgated, it has been my deliberate conviction that the exposition of the Constitution by Judge Bobert Whyte, in Simpson v. The State, 6 Yerg., 360, was much more correct than that of Judge Green in Aymette v. The State, 2 Hum., 155. The expression in the case last named, that the citizens do not need, for the purpose of repelling encroachments upon their rights, “the use of those weapons which are usually employed in private broils, and are efficient only in the hands of the robber and assassin,” is, in my view, an unwarrantable aspersion upon the conduct of many honorable men who were well justified in using them in self-defense. Ibid, 158. The provision contained in the declaration of rights in the Constitution of 1834, that “that the free white men of this State have a right to keep and bear arms for their common defense,” is not restricted to public defense, as held in Aymette v. The State, 2 Hum., 158. *194 Had such been the intention, the definite article “the/’ would have been employed, instead of the personal pronoun “their,” which is used in a personal sense, and was intended to convey the idea of a right belonging equally to more than one, general in its nature, and universally applicable' to all the citizens. The word “bear” was not used alone in the military sense of carrying arms, but in the popular sense of wearing them in war or in peace. The word “arms,” means “instruments- or weapons of offense .or defense,” and is not restricted, by any means, to public warfare.
The declaration of rights, section 26, in the Constitution of 1870, omits the words “free white men,” and contains an additional provision, which should be construed in connection with the previous decisions of this court, the conflict in which was well known to the framers of that instrument. After declaring “that the citizens of this State have a right to keep and to bear arms for their common defense,” it is added: “But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime.” The word “bear” was manifestly employed in the Constitution of 1870, to convey the idea of carrying arms either for public or private defense; otherwise, it was unnecessary to add the provision that the Legislature shall have power “'to regulate the wearing of arms with the view to prevent crime.” The habit, or custom, intended to be regulated, was not that of bearing arms fit only to be used in war, and which, from the publicity with which such arms are carried, needed but little, if any, regulation. It was well known to the Convention, that *195 a very large number ef citizens bad become accustomed, 'during, the late civil war, to carry pistols and other weapons not ordinarily used in warfare, and had retained this habit after the close of the war, and that dangerous wounds, as well as frequent homicides, were the result of its universal prevalence; and the object of conferring express power to regulate the mode of wearing them, was not to destroy the right, but so to control it that the Legislature, by declaring that such arms should be worn publicly and not secretly upon the person, might prevent those crimes which are often committed by armed men in taking the lives of their unarmed adversaries. To “regulate” does not mean to destroy, but “to adjust by rule,” “to put in good order,” to produce uniformity of motion or of action; and, under this provision, there can be no question that, while the Legislature has no power to prohibit the wearing of arms, it has the right to declare- that, if worn upon the person, they shall he worn in a public manner. The act of 1870, instead of regulating, prohibits the wearing of arms, and is, therefore, in my opinion, unconstitutional and void.
In Bliss v. Commonwealth, 2 Lit., 90, the- statute to prevent persons wearing concealed arms, was held unconstitutional, as infringing the right of the people to- bear arms in defense of themselves and the State. See Cooley Const. Lim., 350; Cockram v. The State, 24 Texas, 401. The words “ in defense of themselves and the State,” are equivalent to the words “for their common defense,” and but for the power to regulate, ingrafted upon the Constitution of 1870, should be interpreted, here as they *196 were in Kentucky: “The words ‘rules and regulations,’ in the Constitution of the United States, are usually employed in the Constitution in speaking of some particular specified power, which it means to confer on the government, and not, as we have seen, when granting general powers of legislation: as, to make rules for the government and regulation of the land and naval forces; to ‘regulate’ commerce; to establish an uniform rule of naturalization; to coin rnone}7 and ‘regulate’ the value thereof. In all these, as in respect to the Territories, the words are used in a restricted sense:” Paschal’s Anno. Const., 238; Scott v. Sandford, 19 How., 337; 2 Story’s Const., 3d ed., 196, 213.
Neither the old nor the new Constitution confers the right to keep, or to bear, or to wear arms, for the purpose of aggression. The right exists only for the purpose of defense; and this is a right which no constitutional provision or legislative enactment can destroy. The right to the enjoyment of life is one of the “inalienable rights” with whieh the Declaration of Independence declares that all men are endowed by their Creator. And one of the most classical and elegant of all legal commentators declared, in regard to the great right of self-defense, that the law, in this case, respects the passions of the human -mind, and (when external violence is offered to a man himself, or to those to whom he bears a near connection,) makes it lawful in him to do himself that immediate justice to which he is prompted by nature, and which no prudential motives ai’e strong enough to restrain. It ■considers that the future process of thé‘“ law is by no means an adequate remedy for injuries accompanied with *197 force, since it is impossible to say to what wanton lengths of rapine or cruelty outrages of this sort might be carried, unless it were permitted a man, immediately, to oppose one violence with another. Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be, in fact, taken away by the law of society:” 3 Black. Com., 34, m. In accordance with this view, I hold that when a man is really and truly endangered by a lawless assault, and the fierceness of the attack is such as to require immediate resistance in order to save his own life, he may defend himself with any weapon whatever, whether seized in the heat of the conflict, or carried for the purpose of self-defense. He is not bound to humiliate or, perchance, to perjure himself, in the slow and often ineffectual process of “swearing the peace,” or to encourage the onslaught of his adversary by an acknowledgment of timidity or cowardice. It is deeply to be regretted that any peaceful citizen should be placed in a condition making it necessary for him to carry arms for his own protection, and that a purpose, laudable and honorable in itself, is often perverted by “lewd fellows of the baser sort” to purposes of assassination or revenge. But some of the most important elements in nature, such, for example, as fire and water, may be so misused and perverted. Yet we do not prohibit or destroy their use. We endeavor only to regulate it.
In the purer and better days of the Republic, “a well-regulated militia was regarded as necessary to the security of a free state;” and it was declared in the first amendment to our National Constitution, that “the *198 right of the people to keep and to bear arms should not be infringed,’
So, “by the Anglo-Saxon laws, or rather by one of the primary and indispensable condit:ons of political society, every freeholder, if not every freeman, was bound to defend his country against hostile invasion;77 and by the statute of 'Winchester, 13 Edw. I., every man between the ages of 15 and 60 was to be assessed and sworn to keep armor according to the value of his lands and goods: for 15 pounds and.upward in rent, or 40 marks in goods, a hauberk, an iron breast-plate, a sword, a knife and a horse; for smaller property, less extensive *199 arms. See Hallam’s Cons. Hist., 311. Those laws were subsequently repealed or modified in the interests of despotic power. And Mr. Tucker, in his notes to Blackstone, says that "whoever examines the forest and game laws in the British Code, will readily perceive that tire right of keeping arms is taken away from the people of England.” See 1 Sharsw. Black., 143. A jealous concern for public liberty and personal security animated our patriotic ancestors to encourage the use of arms. It was once the policy, too, of our State Government to foster a martial spirit among the people, and to train them to the use of arms, not only for the purpose of *200 national defenst, but also in eases of necessity, for the defense of their own persons. The tendency now appears to be the other way, and passive obedience and slavish submission to wrong and outrage would seem to be the growing spirit of the times. While “shooting matches” were once encouraged by the Legislature, as a proper method of accustoming the citizens to the use of arms, the timid course of existing legislation is to make the peace warrant the only potent weapon of defense, and to teach the people to “have peace” upon any terms, no matter how degrading.
*198 Note. Knoxville, Nov. 4, 1871.
Thomas Page v. The State.
Carrying Arms. Act of 1870 construed. It is not every removal of a pistol or other weapon from plaoe to place, that constitutes a “carrying17 within the meaning of the act of 1870, o. 13, which prohibits carrying arms. To constitute the offense, the weapons must be carried as “arms.77
PROM KNOX.
Criminal Court, May Term, 1871. M. L. Hall, J., presiding.
Prosser, for the plaintiff in error, insisted, that under the Constitution the citizen was protected in an unlimited right to carry all lands of arms without reference to size or quality, and had the right to keep and to bear arms at all times; the Legislature having the right to say how he shall wear them, but not to prohibit. The act of 1870 takes from the citizen the right to familiarize himself with the use of arms of the smaller class, and so infringes the Constitution.
Attorney General PIeiskell, for the State, insisted that carrying weapons carrying arms, means going armed. To carry, has many senses; to carry a scar; to carry a tune; to carry a loan. The word is not happily selected; but the objection is not, that it does not bear the exact meaning the Legislature intended to convey, but that it has other meanings, tending to confuse. A man may carry a wheelbarrow load of pistols to,a shop; may carry them for repair, as merchandize; may carry in bundles, or boxes, or baskets; may *199 cany pistols hunting, or to a gallery or tree to practice. In none of these cases would he be carrying them in the sense of the law. The law so construed, does not infringe the right to keep arms, or practice with them, or hear them for the common defense. Where a law admits of a construction consistent with the Constitution, it must be so construed : Bristoe v. Evans, 2 Tenn., 341, 345; Bank of State v. Cooper, 2 Yer., 590, 623; Townsend v. Shipp, Cooke, 294, 301; L. & N. Railroad Co. v. Davidson Co., 1 Sneed, 637, 671; Fisher v. Dabbs, 6 Yer., 119, 135.
“Common defense,” in the Constitution, has one of two senses. It can noi have both. It either means defense as a community, or the individual defense of each man commonly, or on ordinary occasions. Now we know that it was intended to embrace the idea of general defense; it can not, therefore, mean the other, unless it be used in a double sense, in two opposite and distinct senses. The bearing of arms, then, is only protected on the occasions and when used in a manner appropriate to the public defense, as a citizen soldier. To keep for that purpose, necessarily includes the right to keep at all times and under all circumstances; but to bear for that use, means to bear on such occasions, at such times, and in such manner, as may be appropriate to that end. Not to wear weapons. It must mean after the fashion of a soldier, not after the manner of a cut-throat.
NicholsoN, C. J., delivered the opinion of the Court.
Page was indicted for carrying a belt pistol, a pocket and revolver. Upon his trial, on the plea of not guilty, he was convicted, fined and sentenced to imprisonment. He has appealed to this Court. It appears from the evidence in the bill of exceptions, that Page was seen coming from his *200 home along the big road, about a mile distant from his house, carrying in his hand', swinging by his side, a pistol called a revolver, about eight inches long, but that it was not such weapon as is used as a weapon of war. He was not on a journey, nor was he a public officer. Ho other instance of his carrying a pistol is proven. He approached prosecutor, presented the p>is-tol and threatened to shoot him. Was this such a carrying of a weapon as is prohibited by the act of 1870, c. 13? Shanldand, 95. The evidence fully establishes the fact, that the pistol carried by Page was not an arm for war purposes; and therefore, under the ruling of this Court in the case of Andrews v. The State, decided at Jackson, it was a weapon, the carrying of which the Legislature could constitutionally prohibit. But the question here is, what is the meaning intended by the Legislature to be conveyed by the word “carry’'? It will be observed, that the prohibitory clause of the Constitution uses the words, “keep and bear arms,” &c. The Legislature has avoided using this language, but has used a word, which, as connected with weapons, conveys the idea of “wearing weapons,” or “going armed.” When we use the expression, “he carries arms,” we mean “he goes armed,” or “he wears arms.” This is manifestly the sense in which the word was used by the Legislature, and we know of no other single word which could more clearly convey the meaning intended to be conveyed, than the word “carry.” In this sense, Page was not only literally carrying a forbidden weapon, but he was “carrying” it, that is, “he was going armed,” contrary to the true meaning of the statute.
It will bo observed, that the interpretation which we give to the word “carry,” meets and carries out the manifest purposes of the Legislature, which was, not only to make criminal the habitual carrying or wearing of dirks, sword-canes, Spanish stilettos, belt or pocket pistols, or revolvers, *201 but, also, to make criminal a single act of wearing or carrying one of these weapons, when it is so worn, or carried, with the intent of thus going armed.
But we are far from understanding the Legislature as intending to make every act of carrying one of these weapons criminal. Under the constitution, every man has It right to own and keep these weapons, nor is this right interferred with by the prohibition against “carrying” them, in the sense in which the Legislature uses the word. To constitute the carrying-criminal, the intent with which it is carried must be that of going armed, or being armed, or wearing it for the purpose of being armed. In the case before us, the intent with which Page was carrying his pistol was fully developed. He was carrying it that he might be armed, as was shown by his threatened assault upon the prosecutor. It would probably be difficult to enumerate all the instances in which one of these weapons could be carried innocently, and without criminality. It is sufficient here to say, that, without the intent or purpose of being or going armed, the offense described in this statute can not be committed.
Wo think the facts proven, in the case before us, bring the plaintiff in error within the offense defined in the statute, and that his conviction was fully warranted by the evidence.
The judgment is affirmed.
Regretting, as I do, that the nobler objects of bearing and wearing arms are too often and too horribly perverted, I can not approve legislation which seems to foster and encourage a craven spirit on the part of those who are disposed to obey the laws, and leaves them to the tender mercies of those who set all law at defiance.
I concur in the foregoing dissenting opinion.
Turney, J.