

KEN PAXTON

ATTORNEY GENERAL OF TEXAS

October 29, 2025

The Honorable Glen Harwood
142nd Judicial District Attorney
500 North Loraine Street, Suite 200
Midland, Texas 79701

      **Opinion No. KP-0501**

      Re: The carrying of concealed firearms in courtrooms by the District Attorney and Assistant District Attorneys under Texas Penal Code § 46.15(a)(6) and (a)(7) (RQ-0598-KP)

Dear Mr. Harwood:

      Your inquiry concerns the right to lawfully carry a concealed firearm in court.[1] For context, you explain that you and your assistant district attorneys are licensed to carry concealed firearms. Request Letter at 1. "Certain district judges and county court-at-law judges" have nonetheless implemented a policy that prohibits any person "who is not a bailiff or peace officer from carrying a firearm in government courts in Midland County." *Id.* You also indicate that the Court Security Committee is contemplating enacting an identical policy. *Id.* at 1−2. In light of these circumstances, you ask whether the Penal Code provides "affirmative statutory authority for licensed prosecutors to carry concealed firearms in government courts in the ordinary course of their duties" or serves merely as a defense to prosecution. *Id.* at 1. You also ask whether "a district or county court-at-law judge" has authority to "forbid the carrying of concealed firearms by licensed prosecutors" in the judge's respective court and, relatedly, whether the Court Security Committee has authority to implement the same policy for "courts in Midland County." *Id.*

      **Texas has drawn upon history and tradition to maximize law-abiding citizens' affirmative right to publicly carry firearms through statutory defenses and exceptions.**

      It is well known that "the right of the people to keep and bear Arms[] shall not be infringed." U.S. CONST. amend. II; *accord* TEX. CONST. art. I, § 23 ("Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State[] . . . ."). This guarantee represents a "fundamental," "necessary" pillar of "our system of ordered liberty," *McDonald v.*

---

[1] Letter from Mr. Glenn Harwood, Midland Cnty. Dist. Att'y, to Hon. Ken Paxton, Tex. Att'y Gen. at 1 (May 2, 2025), https://www.texasattorneygeneral.gov/sites/default/files/request-files/request/2025/RQ0598KP.pdf ("Request Letter").

*City of Chicago*, 561 U.S. 742, 778 (2010), which "secures for Americans a means of self-defense," *United States v. Rahimi*, 602 U.S. 680, 690 (2024); *see also, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) (highlighting the "individual right to possess and carry weapons"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 32 (2022) (highlighting the right to "carry[] handguns publicly for self-defense"). But the right does not derive *from* government; it *precedes* the Constitution, which simply "recognizes [its] pre-existence." *Heller*, 554 U.S. at 592.

Indeed, "[t]he spark that ignited the American Revolution was struck" against this reality. *Rahimi*, 602 U.S. at 690; *see also, e.g.*, *Heller*, 554 U.S. at 594. During "the tumultuous decades of the 1760's and 1770's, the Crown began to disarm" American colonies—whose response drew from "their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. Early "Americans understood the 'right of self-preservation' as permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf[] may be too late to prevent an injury.'" *Id.* at 595 (alteration in original) (quoting 1 BLACKSTONE'S COMMENTARIES 145–46, n.42 (1803)). It thus comes as little surprise that the first shots of the Revolutionary War were preceded by a British officer's futile command: "[T]hrow down your Arms and disperse." *Wednesday's Post*, THE DERBY MERCURY, May 26, 1775, at 3 (reprinting ESSEX GAZETTE (Salem) (Apr. 25, 1775)).

This lesson was not soon forgotten. During the Reconstruction era, too, it was understood that to "[d]isarm a community" is to "rob them of the means of defending life" and "liberty" alike. *Rahimi*, 602 U.S. at 690 (quoting CONG. GLOBE, 40th Cong., 2d Sess. 1967 (1868)). Though "Union Army commanders took steps to secure the right of all citizens to keep and bear arms, . . . Congress concluded that legislative action was necessary." *McDonald*, 561 U.S. at 773 (footnote omitted). This resulted in statutes like "the Freedmen's Bureau Act of 1866, which provided that . . . 'the constitutional right to bear arms[] shall be secured to and enjoyed by all the citizens . . . without respect to race or color.'" *Id.* (alteration in original) (emphasis omitted) (quoting Freedmen's Bureau Act, ch. 200, 14 Stat. 176–77 (1866)). Likewise, "Congress's desire to enable the newly freed slaves to defend themselves against former Confederates helped inspire the passage of the Fourteenth Amendment, which secured the right to bear arms against interference by the States." *Rahimi*, 602 U.S. at 690.

Texas inherited and expanded upon this fundamentally American sentiment. *See generally* Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629, 634 (1989) (observing "[t]he right to keep and bear arms was both a republican principle[] . . . and a practical necessity for the early settlers"). Not only did the Texas Declaration of Independence make express note of Santa Anna's demand that Texans "deliver up our arms," THE DECLARATION OF INDEPENDENCE para. 13 (Tex. 1836) (highlighting they are "essential to our defence, the rightful property of freemen, and formidable only to tyrannical governments"), but the Constitution of the Republic of Texas—an "independent, national constitution" from which our modern charter derives, *Davenport v. Garcia*, 834 S.W.2d 4, 15 (Tex. 1992)—expressly confirmed that "[e]very citizen shall have the right to bear arms in defence of himself and the republic." REPUB. TEX. CONST. art. XIV, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897* (Austin, Gammel Book Co. 1898). This guarantee was rooted in the observance that "[t]he right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute" and "does not derive from the state government[] but directly from the sovereign convention of the people that framed [it]." *Cockrum v. State*, 24 Tex. 394, 401–02 (1859); *accord*

*Heller*, 554 U.S. at 592. Recognition of gun rights therefore continued unabated in each constitution that followed, TEX. CONST. art. I, § 13 (1845); TEX. CONST. art. I, § 13 (1861); TEX. CONST. art. I, § 13 (1866); TEX. CONST. art. I, § 13 (1869); TEX. CONST. art. I, § 23 (1876), and forever memorialized "a strong moral check against the usurpation of arbitrary power by rulers," TEX. CONST. art. I, § 23 interp. commentary (West 2022).

This truth persisted even in the aftermath of our Civil War. Gun rights advanced liberty for freed, black Texans who famously "procured great numbers of old army muskets and revolvers" in order "to protect themselves" with "vigor and audacity." *Bruen*, 597 U.S. at 62 (quoting S. Exec. Doc. No. 43, 39th Cong., 1st Sess., at 8 (1866)). "[B]ands of armed whites [were nonetheless] traversing the country" and "forcibly robbing the freedmen of their arms," which led to predictions "that the law-abiding will be compelled, in the exercise of the sacred right of self defense, to organize for their own protection."[2] Halbrook, *supra*, at 654–55 (citations and internal quotations omitted). Seeking to avoid widespread conflict, however, the Texas Legislature enacted a controversial law "to regulate the keeping and bearing of deadly weapons," which "[f]or the first time . . . prohibited the bearing of all arms other than rifles and shotguns at any place off of one's premises." *Id.* at 657–58 (citing Act of Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 927 (Austin, Gammel Book Co. 1898)) (internal quotations omitted). Though the Texas Supreme Court ultimately held the law constitutional—in a pair of cases the U.S. Supreme Court later described as "outliers" that "provide little insight into how postbellum courts viewed the right to carry protected arms in public," *Bruen*, 597 U.S. at 6—it did so only after emphasizing the law "ma[de] all necessary exceptions[] . . . [for] deadly weapons [to] be carried as [a] means of self-defense." *English v. State*, 35 Tex. 473, 477 (1872); *see also State v. Duke*, 42 Tex. 455, 459 (1875) (noting the law "appear[ed] to have respected the right to carry a pistol openly . . . for self-defense").

The ensuing constitutional convention set out to include "as many safeguards as possible to prevent the recurrence of such widespread and flagrant abuse of power," A.J. Thomas, Jr. & Ann Van Wynen Thomas, *The Texas Constitution of 1876*, 35 TEX. L. REV. 907, 913 (1957)—including the "broad legislative power in the 1869 Constitution and . . . the unpopular 1871 act," Halbrook, *supra*, at 668. This resulted in the Constitution of 1876, which still governs to this day, and courts thereafter reaffirmed the long-prevailing ethos that had shaped most of Texas history: "[H]aving arms for [a person's] own defence and that of the State[] . . . is one of the surest safeguards of liberty and self-preservation," representing "[o]ne of [the] most sacred rights" that "is not within the scope of legislative authority" to remove. *Jennings v. State*, 5 Tex. Ct. App. 298, 300–01 (1878).

---

[2] Perhaps the most prominent example lies in "the infamous Colfax Massacre in Louisiana on Easter Sunday 1873," where scores of black Louisianans "were slaughtered by a rival band of armed white men." *McDonald*, 561 U.S. at 757. The echoes of carnage eventually reached the Supreme Court, which confirmed that the right to bear arms was not "in any manner dependent on [the Constitution] for its existence," *United States v. Cruikshank*, 92 U.S. 542, 555 (1875), but in the same breath followed the misguided course struck three years earlier—leaving the protection of natural, unalienable rights to states alone and hollowing the Privileges or Immunities Clause. *McDonald*, 561 U.S. at 855–56 (Thomas, J., concurring in part) (observing that "*Cruikshank* is," in this sense, "not a precedent entitled to any respect").

Still, the twentieth century harkened a more restrictive national sentiment on firearms. Prohibitions on carrying a concealed firearm were often extended to "all carrying, whether concealed or open," Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 64–65 (2017), and Texas generally followed suit. *See, e.g.*, TEX. PENAL CODE art. 483 (Vernon's 1948) (prohibiting "[u]nlawfully carrying arms"); *see also, e.g.*, Occupation Tax on Sale of Pistols, 42d Leg., R.S., ch. 267, § 1, 1931 Tex. Gen. Laws 447, 447–48 (requiring a government-issued "certificate of good character" to purchase a handgun). This a-constitutional trend reached its zenith during the 1970s and 1980s, a period during which "carrying a gun in public[] was forbidden for many law-abiding citizens" and "[c]ourts put up no resistance to gun restrictions." Renée Lettow Lerner, *The Resilience of Substantive Rights and the False Hope of Procedural Rights: The Case of the Second Amendment and the Seventh Amendment*, 116 NW. U.L. REV. 275, 308–09 (2021). Yet the states reclaimed their constitutional mantle once it became clear that these restrictive policies failed to achieve the stated goal of stemming rising crime rates. "Florida became the first state with major urban populations to ensure that almost all law-abiding adults could get a concealed-carry permit," *id.* at 311; *see also* Jack Hagler Self Defense Act, ch. 87-24, § 2, 1987 Fla. Laws 135 (amending FLA. STAT. § 790.06), and Texas soon followed.

In 1995, Texas inaugurated a quarter-century effort to expand the scope of gun rights—beginning with its concealed-carry licensing framework. *See generally* Act of May 16, 1995, 74th Leg., R.S., ch. 229, 1995 Tex. Gen. Laws 1998, 1998–2015. The Legislature decriminalized the licensed possession of a concealed handgun not by an affirmative statement of right but through enumerated defenses to unlawful "carrying." *Id.* § 2 at 2013. This statutory overhaul also identified the locations in which licensed carry was not permitted and began removing political subdivisions' regulatory authority over the same. *Id.* §§ 2–4, 7 at 2013–15. Not long after, the Legislature enacted Penal Code section 30.06 to specify the narrow grounds on which licensed possession of a concealed firearm could constitute trespass. Act of May 29, 1997, 75th Leg., R.S., ch. 1261, § 23, 1997 Tex. Gen. Laws 4766, 4775–76. The years that followed saw a steady expansion of eligibility for licensure, Act of May 23, 2005, 79th Leg., R.S., ch. 486, § 1, 2005 Tex. Gen. Laws 1347, 1347 (adding Government Code subsections 411.172(g) and 411.172(h)); Act of May 18, 2021, 87th Leg., R.S., ch. 203, §§ 1–2, 2021 Tex. Gen. Laws 447, 447–48 (adding Government Code subsection 411.172(i) and section 411.1735), and the Penal Code's geographic restrictions on lawful possession shrank as the Legislature legalized yet more license-based conduct by way of defenses and exceptions, *see, e.g.*, Act of May 31, 2003, 78th Leg., R.S. ch. 1178, § 1, 2003 Tex. Gen. Laws 3364, 3364 (narrowing the scope of firearm-related trespass through Penal Code subsections 30.05(f) and 30.06(e)); *see also, e.g.*, Act of May 23, 2007, 80th Leg., R.S., ch. 693, §§ 1–2, 2007 Tex. Gen. Laws 1318, 1318 (narrowing the scope of unlawful possession under Penal Code section 46.02); Act of May 24, 2007, 80th Leg., R.S., ch. 1214, §§ 1–2, 2007 Tex. Gen. Laws 4100, 4100–01 (same, bailiffs licensed to conceal carry); Act of May 25, 2007, 80th Leg., R.S., ch. 1222, § 6, 2007 Tex. Gen. Laws 4117, 4119 (same, various licensed prosecutors); Act of May 26, 2017, 85th Leg., R.S., ch. 1143, §§ 8–9, 11–13, 2017 Tex. Gen. Laws 4355, 4357–59 (adding defenses for volunteer emergency services personnel and federal prosecutors); Act of May 2, 2019, 86th Leg., R.S., ch. 39, §§ 2–3, 2019 Tex. Gen. Laws 82, 83–85 (adding various defenses to trespass on the basis of licensed carry); Act of May 28, 2021, 87th Leg., R.S., ch. 1008, §§ 5–6, 2021 Tex. Gen. Laws 2679, 2680 (same, hotel guests). The Legislature also expanded the means by which license holders could lawfully carry firearms. *See* Act of May 27, 2015, 84th Leg., R.S.,

ch. 437, §§ 16–28, 47, 2015 Tex. Gen. Laws 1706, 1710–14, 1719 (amending Government Code chapter 411, subchapter H, and the predecessor to Penal Code section 46.03); Act of May 20, 2021, 87th Leg., R.S., ch. 481, §§ 1–5, 2021 Tex. Gen. Laws 968, 968–70 (amending holstering requirements); *see also, e.g.*, *State v. Ross*, 573 S.W.3d 817, 825 (Tex. Crim. App. 2019).

"[U]ncooperative" government entities nonetheless tried to restrict the breadth of Texans' firearm rights amid this legislative renaissance and purported to "ban Texas citizens from carrying where it [was] legal." S. Rsch. Ctr., Bill Analysis, Tex. S.B. 273, 84th Leg., R.S. (2015). In turn, the Legislature expressly prohibited political subdivisions from frustrating the democratic premium placed on licensed possession, Act of May 23, 2015, 84th Leg., R.S., ch. 593, § 1, 2015 Tex. Gen. Laws 2000, 2000–01 (adding Government Code section 411.209)—eventually going as far as to forbid "any action" that "states or implies" otherwise and subjecting violators to daily civil penalties, mandamus, and other equitable relief.[3] Act of May 21, 2019, 86th Leg., R.S., ch. 784, § 1, 2019 Tex. Gen. Laws 2229, 2229–30 (amending Government Code section 411.209). Notably, the only exception to this embargo resided with refusing licensed carry in statutorily prohibited locations. *Id.* § 1(a) at 2229 (codified at TEX. GOV'T CODE § 411.209(a)).

The Legislature punctuated these efforts with the Firearm Carry Act of 2021, which amended a host of Texas statutes to once more increase the scope of lawful firearm possession and include unlicensed carry. 87th Leg., R.S., ch. 809, 2021 Tex. Gen. Laws 1960, 1960–73 (amending, *inter alia*, the Code of Criminal Procedure, Government Code, Local Government Code, and Penal Code). As a result, Texans who met age- and record-based qualifications could carry a handgun in public—openly or concealed—without a license. *Id.* Realizing that "[t]he Legislature determines public policy through the statutes it passes," *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 665 (Tex. 2008), the quarter century leading to the Firearm Carry Act of 2021 made clear that law-abiding Texans possess an affirmative right to publicly possess firearms in fora "not expressly prohibited by law." *See generally* S. Rsch. Ctr., Bill Analysis, Tex. H.B. 2112, 87th Leg., R.S. (2021); S. Rsch. Ctr., Bill Analysis, Tex. S.B. 550, 87th Leg., R.S. (2021) (same).

**Penal Code section 46.15 vests certain persons with an affirmative right to lawfully carry firearms in locations that are otherwise prohibited to others.**

Whether section 46.15 authorizes prosecutors to carry concealed firearms with a license in state courts is, ultimately, a question of statutory construction. This requires that we "ascertain[] and giv[e] effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007). In doing so, we must "presume the Legislature selected statutory words, phrases, and expressions

---

[3] Notably, this office withdrew KP-0108—an opinion that correctly observed neither section 30.06 nor 30.07 could be read to prohibit a license holder from carrying a firearm on government-owned property *but did not* interpret the current, broader version of Government Code section 411.209—given the State Fair of Texas' inappropriate reliance on the outdated statement of law contained therein. *See generally* TEX. ATT'Y GEN., OPINIONS OVERRULED, MODIFIED, AFFIRMED, WITHDRAWN, https://www.texasattorneygeneral.gov/opinions/opinions-overruled-modified-affirmed-withdrawn (last visited Sept. 11, 2025).

deliberately and purposefully and was just as careful in selecting the words, phrases, and expressions that were included or omitted." *In re Xerox Corp.*, 555 S.W.3d 518, 527 (Tex. 2018).

Here, the statutory text is clear. Section 46.02 of the Penal Code criminalizes the unlawful carrying of weapons under a variety of circumstances,[4] TEX. PENAL CODE § 46.02, and offenses thereunder range in gravity, *id.* § 46.02(d)–(e). Section 46.03, on the other hand, prohibits licensees from carrying firearms and other prohibited weapons in certain specified locations such as "the premises of any government court or offices utilized by the court, unless pursuant to written regulations or written authorization of the court."[5] *Id.* § 46.03(a)(3). Yet subsection 46.15(a) unambiguously states that Penal Code "[s]ections 46.02 and 46.03 do not apply to" certain persons—like district attorneys and assistant district attorneys—who are "licensed to carry a handgun under Subchapter H, Chapter 411, [of the] Government Code."[6] *Id.* § 46.15(a)(6)–(7).

The consequence of this exception is unmistakable. Unlike ordinary licensees who are prohibited from carrying firearms in court *unless* expressly authorized, *id.* § 46.03(a)(3), the individuals listed in subsection 46.15(a) need not seek leave from a prohibition that does not apply in the first instance. We therefore disagree with the Midland County Attorney's suggestion that subsection 46.03(a)(3) somehow vests the judiciary with "ultimate discretion as to the admission of firearms [by district attorneys] into the courtroom."[7] This reading contradicts the plain language of the Legislature's carefully crafted framework and betrays the "cardinal rule . . . that each sentence, clause, phrase and word be given effect if reasonably possible." *Morter v. State*, 551 S.W.2d 715, 718 (Tex. Crim. App. 1977); *see also, e.g.*, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012) (explaining "[t]he imperative of harmony among provisions is more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves"). It follows that the Midland County District Attorney—like all other individuals expressly named in section 46.15(a)—possesses an affirmative right to carry a concealed firearm onto the premises of state courts.[8] *See, e.g.*, Tex. Att'y Gen. Op. No. KP-0332 (2020) at 4 (concluding a prosecuting attorney's investigator is authorized to carry a firearm in court under subsection 46.15(a)(1)).

---

[4] We note that at least one court found Penal Code section 46.02 unconstitutional to the extent it prohibited "law-abiding 18-to-20-year-olds from carrying handguns for self-defense outside the home based solely on their age" because the "statutory scheme violate[d] the Second Amendment." *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 758 (N.D. Tex. 2022).

[5] In construing this provision, we have acknowledged that a state governmental entity may prohibit handguns from only those locations governed by Penal Code section 46.03. *See* Tex. Att'y Gen. Op. No. KP-0047 (2015) at 3.

[6] We were not asked and offer no comment on whether a concealed handgun license similarly excepts enumerated individuals from the prohibition on *other* weapons, for which a license to conceal carry a firearm would serve no purpose, listed in the Penal Code. *See generally* TEX. PENAL CODE § 46.03(a) (addressing the possession of "a firearm" in addition to a "location-restricted knife, club, or prohibited weapon listed in Section 46.05(a)").

[7] Brief from Hon. Russell W. Malm, Midland Cnty. Att'y., to Op. Comm. at 4 (May 14, 2025) ("Midland County Attorney Brief") (on file with the Op. Comm.).

[8] You do not ask about a district attorney's right to licensed, concealed carry in proceedings where they appear as a named party or witness—instead acknowledging that a judge could validly exclude a licensee from possessing a firearm in such scenarios—nor does your inquiry call for us to address the notion of concealed carry in federal court. Request Letter at 1–4. We therefore offer no comment on either topic.

History, too, confirms what is otherwise apparent on the face of the Penal Code. Before 2005, judges were permitted to "carry concealed firearms in and on the premises of a state courthouse, in addition to other places prohibited to those with a concealed carry license." H. Comm. on Law Enf't, Bill Analysis, Tex. C.S.H.B. 2110, 79th Leg., R.S. (2005). But the law did "not make similar allowances for district attorneys who [were] also under the threat of retaliation or retribution from violent defendants," and courthouse shootings "in Tyler, Texas and Atlanta, Georgia" prompted the amendment of Texas Penal Code section 46.15 to grant district attorneys the same privileges given "that people [were] willing to commit violent acts and target those individuals directly involved in the prosecution of defendants." *Id.* Later, the Legislature again expanded section 46.15—once more providing an express exception to what was otherwise prohibited,[9] *see supra* pp. 4–5—to provide assistant district attorneys with the same protection that both district attorneys and judges had come to enjoy. H. Comm. on Law Enf't, Bill Analysis, Tex. C.S.H.B. 2300, 80th Leg., R.S. (2007).

Taken together, the plain text of the Penal Code and statutory history leave no doubt that district attorneys and assistant district attorneys with concealed-carry licenses possess an affirmative right to carry concealed firearms in court.

**Neither a judge nor court security committee can categorically prohibit lawful concealed carry by district attorneys or their assistants.**

You also tell us that some local courts already ban licensed, concealed carry of handguns in courtrooms for all but bailiffs and peace officers.[10] Request Letter at 2. Likewise, you explain that your local court security committee proposes to implement an identical policy—aiming to promote "general courtroom safety," prevent any negative "effects that a concealed weapon inadvertently seen by a witness or juror may have on fairness in a proceeding," and avoid "the potential volatile situations in which an armed individual may be a party or witness . . . in a divorce or child custody proceeding," *id.* at 2, 4. As explained below, however, these ends cannot justify the categorical means you describe.

It is axiomatic that all Texas courts are invested with the "judicial power of this State." TEX. CONST. art. V, § 1. Yet that power is not unbounded. *See generally* Tex. Att'y Gen. Op. No. KP-0489 (2025) at 2–4, 15–18 (detailing the constitutional breadth of "the judicial power" and the extent to which certain "orders" are *coram non judice*); *see also, e.g.*, *In re State*, 162 S.W.3d 672, 678 (Tex. App.—El Paso 2005, no pet.) (concluding a court did not have "express, inherent, or implied grant of power" to act). The judicial power "includes two broad categories: 'jurisdictional power' and 'administrative powers.'" *Tex. Dep't of Fam. & Protective Servs. v. Grassroots*

---

[9] This belies the need to distinguish our prior reference to Penal Code "exceptions," Tex. Att'y Gen. Op. No. KP-0332 (2020) at 2, from our present recognition of an affirmative right. Both the text and history of the Penal Code reveal that the two are, for present purposes, one in the same.

[10] The Midland County Attorney implies that these policies are memorialized by court order, asserting that the Penal Code cannot "grant the right to carry firearms against court orders." Midland County Attorney Brief at 4. But not all "orders" are valid exercises of the judicial power, Tex. Att'y Gen. Op. No. KP-0489 (2025) at 2–4, 15–18 (detailing the extent to which certain "orders" are *coram non judice*), and we are aware of no "orders" that are said to arise from a constitutionally cognizable exercise of jurisdiction. We therefore speak generally to the propriety of a categorical ban on licensed concealed carry by district attorneys and their assistants in court.

*Leadership, Inc.*, 717 S.W.3d 854, 867–68 (Tex. 2025). While the former implicates "power 'to adjudicate cases or liquidate law'" in constitutionally cognizable controversies, *id.* at 868 (quoting *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 489 (Tex. 2024)), administrative powers sound in the judiciary's "inherent" authority, *Webster*, 704 S.W.3d at 494 (discussing the Texas Supreme Court's power to regulate the practice of law). Inherent authority derives "from the very fact that the court has been created and charged by the constitution with certain duties and responsibilities," and a court "may call upon [this power] to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity." *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979); *accord Webster*, 704 S.W.3d at 494; *see also, e.g.*, TEX. GOV'T CODE § 21.001(a). From this flows the power to "command respect and decorum in courtroom proceedings," *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 729–30 (Tex. 2020), and justice requires that "dignity, order, and decorum be the hallmarks of all court proceedings in our country," *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970).

It is thus well accepted that courts are "vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227 (1821)). This includes sanctioning behavior "even when the offensive conduct is not explicitly prohibited by statute, rule, or other authority." *Brewer*, 601 S.W.3d at 718. Nonetheless, "'inherent powers must be exercised with restraint[,] discretion' and 'great caution'" in light of "their very potency" as well as the fact that "inherent powers are shielded from direct democratic controls.'" *Id.* at 717–19 (alteration in original) (footnote omitted) (citations omitted). The authority to maintain courtroom decorum and facilitate the administration of justice must prove "consistent with the [C]onstitution and statutes." *State v. Nunez*, 704 S.W.3d 598, 621–22 (Tex. App.—Houston [1st Dist.] 2024, pet. ref'd) (mem. op.) (quoting *In re State ex rel. Skurka*, 512 S.W.3d 444, 452 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.)); *see also, e.g.*, Tex. Att'y Gen. Op. No. 0490 (2025) at 2–8 (endorsing the Supreme Court of Texas' authority to promulgate rules consistent with the Constitution and relevant state laws). This alone demonstrates the impropriety of a categorical prohibition on district attorneys or their assistants from licensed concealed carry in court—let alone outside of a justiciable controversy pertaining thereto, Tex. Att'y Gen. Op. No. KP-0489 (2025) at 2–4, 15–18—simply because they happen to practice in Midland County. *See generally* TEX. PENAL CODE § 46.15(a)(6)–(7).

To be sure, district and county court judges possess express authority to adopt "local rules of administration." TEX. GOV'T CODE § 74.093(a); TEX. R. JUD. ADMIN. 9(b), *reprinted in* TEX. GOV'T CODE, tit. 2, subtit. F app. These rules pertain to docketing, assignment, and transfer of cases, TEX. R. JUD. ADMIN. 9(b)(1), in addition to "any other matter necessary to carry out this chapter or to improve the administration and management of the court system and its auxiliary services," TEX. GOV'T CODE § 74.093(c)(4); *see also id.* § 74.092 (discussing similar duties of a local administrative judge). Furthermore, a court security committee established by the local administrative judge is required to "adopt security policies and procedures." TEX. GOV'T CODE § 74.092(a)(13). But these local rules and policies "must not be inconsistent with other laws or rules." TEX. R. JUD. ADMIN. 10(a); *accord* TEX. R. CIV. P. 3a(b) (requiring the same for "[l]ocal rules, forms, and standing orders"). Indeed, "local court rules do not trump . . . any other statutory requirement" or constitutionally guaranteed right. *In re Rino-K&K Compression, Inc.*, 656 S.W.3d

153, 160 (Tex. App.—Eastland 2022, no pet.). A district attorney's authority to lawfully carry a concealed firearm in court, pursuant to Penal Code section 46.15, is no exception.

The foregoing is further reinforced by the longstanding constitutional reality that "[n]o power of suspending laws in this State shall be exercised except by the Legislature." TEX. CONST. art. I, § 28. Only the Legislature possesses "the legislative power," *id.* art. III, § 1, which encompasses "the power to make, alter, and repeal laws." *In re Tex. Dep't of Fam. & Protective Servs.*, 660 S.W.3d 161, 169–70 (quoting *Diaz v. State*, 68 S.W.3d 680, 685 (Tex. App.—El Paso 2000, pet. denied)). The judicial power, on the other hand, does not countenance limitless authority to suspend a valid statute. *State v. Ferguson*, 125 S.W.2d 272, 276 (Tex. 1939) (orig. proceeding); *accord Hous. Chron. Publ'g Co. v. Mattox*, 767 S.W.2d 695, 698 (Tex. 1989); *see also, e.g.*, Tex. Att'y Gen. Op. No. KP-0489 (2025) at 2–4, 15–18. This is all to say that "constitutional problems arise when one branch pushes beyond the boundaries to interfere with another branch's exercise of its constitutional powers." *Webster*, 704 S.W.3d at 487; *accord In re Tex. House of Representatives*, 702 S.W.3d 330, 345 (Tex. 2024). Here, the categorical prohibition you describe vitiates the Legislature's decades-long effort to craft a concealed-carry framework that vests specified licensees with more authority than is otherwise available to the general public. *See supra* pp. 4–5, 7. Put simply, "[t]o state the nature of [Midland County's desired policy] is to reveal the lack of power in a judge or court to enter it." *Ferguson*, 125 S.W.2d at 276.

## S U M M A R Y

While the judiciary possesses broad authority over courtrooms, that authority does not license a categorical prohibition on lawful forms of concealed carry by individuals—like district attorneys and their assistants—who are expressly exempted from Texas Penal Code sections 46.02 and 46.03.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

JOSH RENO
Deputy Attorney General for Criminal Justice

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

JOSHUA C. FIVESON
Chair, Opinion Committee

AMY L. K. WILLS
Assistant Attorney General, Opinion Committee