# Supreme Court of Texas

No. 24-0023

Jonathan Timothy Noyes,

*Petitioner*,

v.

The State of Texas ex rel. Samantha Jo Voges,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

JUSTICE SULLIVAN, joined by Justice Devine, Justice Young, and Justice Hawkins, concurring.

The great American Antonin Scalia once warned that a bill of rights without a structure for protecting it is just a "parchment guarantee[ ]." Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 Notre Dame L. Rev. 1417, 1418 (2008). As Justice Scalia explained, "[e]very tinhorn dictator in the world, every banana republic, every president for life operates under a bill of rights." Antonin Scalia, Congressional Power (Jan. 24, 2011), *in Scalia Speaks: Reflections on Law, Faith, and Life Well Lived* 213, 217 (Christopher J. Scalia & Edward Whelan eds., 2017). Even "the bill of rights of the

former Evil Empire, the Union of Soviet Socialist Republics, contained guarantees much more expansive than ours." *Id.* None of that stuff mattered, though, because the victims of Communism had no means of enforcing rights on a printed page. Our Founders knew that constitutions are fragile. So they safeguarded liberty with paper *and* steel. Pens may be mightier than swords, but the two together are mightier still.

Little wonder, then, that the historical record around our nation's founding is chock-full of quotes like these:

- "The right of self-defense is the first law of nature . . . ." 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia* 300 (Philadelphia, William Young Birch & Abraham Small 1803).

- No despot can efface the "fundamental, sacred, and unalterable law of self-preservation." John Locke, *Second Treatise of Civil Government* § 149 (1690).

- Laws "that forbid carrying arms . . . disarm only those who are not inclined or determined to commit a crime," thereby "worsen[ing] the condition of the assailed, [and] bettering that of the assailants." Thomas Jefferson, *Jefferson's Legal Commonplace Book* 521 (David Thomas Konig et al. eds., 2019) (quoting Cesare Beccaria, *On Crimes and Punishments* § 40 (1764)).

- "The right of self defense never ceases. It is among the most sacred, and alike necessary to nations and to individuals . . . ." James Monroe, Second Annual Message (Nov. 16, 1818).

Our forefathers learned the importance of a right to armed self-defense the hard way, from dealing with despots like George III and Santa Anna, along with pettier criminals. The right to keep and bear

2

arms, forged in the fires of rebellion and quenched in the waters of victory, is no "second-class right." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion of Alito, J.). It's been handed down generation to generation, from the Saxons to the Sons of Liberty, from the martyrs of the Alamo to the Texas Rangers, all the way to you and to me.

For many decades, however, high courts like ours had nothing to say about what this right means for us today. Our federal counterpart finally piped up in 2008 when it reaffirmed that the Second Amendment still matters in *District of Columbia v. Heller*, 554 U.S. 570 (2008) (Scalia, J.). Yet it's been around a century since this Court has had anything to say about the Second Amendment or about the Arms Clause found in Article I, Section 23 of the Texas Constitution.[1]

Rights, like rifles, must be handled with care. As the U.S. Supreme Court recently held, the Second Amendment doesn't protect everyone with a pistol and a pulse. *See United States v. Rahimi*, 602 U.S. 680 (2024). Without violating the U.S. Constitution, the government can temporarily disarm a person for being subject to a protective order if he's

---

[1] To be fair, the Second Amendment and our Arms Clause have made a few cameos in recent opinions out of this Court. *E.g.*, *Harris County v. Annab*, 547 S.W.3d 609, 615 (Tex. 2018); *Ferguson v. Tex. Dep't Pub. Safety*, 629 S.W.3d 903, 905–09 (Tex. 2021) (Blacklock, J., dissenting from denial of petition for review). And the Court of Criminal Appeals has (mis)construed them on occasion. *See, e.g.*, *Masters v. State*, 685 S.W.2d 654, 655 (Tex. Crim. App. 1985) (per curiam) ("The Second Amendment simply does not [sic] apply to the states or their subdivisions."); *Collins v. State*, 501 S.W.2d 876, 877–78 (Tex. Crim. App. 1973) (citing "interpretative commentary" as a basis for declining "to nullify the purpose for which the Legislature was given the regulatory power; namely, 'to prevent crime'"). The People of Texas deserve better than a handful of drive-by citations by the *Supreme* Court and curt opinions from a lower court.

been found to pose a "credible threat" to another's physical safety. *Id.* at 702. In the wake of *Rahimi*, disarmed bad guys across the country have tried to argue that their cases are somehow different. Petitioner Jonathan Noyes is one of them. He contends that Subchapter A of Chapter 7B of the Texas Code of Criminal Procedure, the protective-order statute that was applied for the purpose of disarming him, violates both the Second Amendment and the Texas Constitution's Arms Clause.

The time is nigh to break our own deafening silence about these constitutional guarantees. It might even happen in this very case, after the court of appeals does its job on the remand we've now ordered—a decision with which I concur. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 869–70 (Tex. 2023) ("[A]s a prudential matter, the law is typically better served when the lower courts review a legal issue before this Court does. Ours is a court of final review and not first view." (quoting *Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012) (internal quotation marks omitted))). I offer these thoughts not to settle the matter, but to stir the pot. My preliminary review leads me to think that Subchapter A raises grave constitutional concerns under both the Second Amendment and our Arms Clause, at least as applied to Noyes in this case.

## I

Noyes started dating Samantha Voges in January 2019, and they began cohabitating shortly thereafter. Domestic bliss did not ensue. Voges described Noyes as "tormenting, mean, [and] harassing." Noyes physically assaulted Voges multiple times, and she later reported the abuse to the police. Noyes also made Voges sleep in a

4

spare room, until the night when he saw fit to knife the air mattress on which she was sleeping.

Two years into their relationship, Noyes came to believe that Voges was cheating on him. So he told her to come pick up her things immediately, or else he would throw her dog and her possessions out onto the street. Voges rushed home and told Noyes that she was breaking up with him. Noyes responded by locking her dog in a bedroom. He later released the dog but boxed Voges into a bathroom and told her she couldn't leave until they talked. Once Voges convinced Noyes to relent, she fled the house with her dog and her belongings.

Within weeks, Noyes started sending Voges threatening and harassing texts, from many different phone numbers, on an almost-daily basis. Voges reported the harassment to the sheriff, but no professionals stepped in to help her. Then, about a month after Voges ended the relationship, Noyes cursed her out via text message for blocking his number and wrote that he was on his way to her workplace.

Over the next few weeks, Noyes unleashed a digital barrage: about 1,500 text messages from dozens of numbers, plus hundreds of emails from various addresses. Those messages were full of vulgarity and threats. He continued to accuse Voges of infidelity and threatened to ruin her life repeatedly, including by disclosing personal information. At one point he tried to coerce her into inappropriate sexual relations. He also used spoofed numbers to make it look like Voges's mother was calling. In total, Voges blocked at least 60 different phone numbers that Noyes used to contact her. She also deleted multiple social-media accounts because he harassed her on those platforms.

5

On one occasion, Noyes told Voges that he would go to her parents' house if she blocked his latest new number. He also sent threatening and harassing texts to her family. Noyes often texted Voges to indicate that he knew where she was; Voges later found a GPS tracking device attached to her car. And he tried to access her bank account, phone account, email account, and other personal accounts.

Noyes's behavior escalated, and so did Voges's fears. She even got a new cellular phone and phone number. But within five days, Noyes somehow learned her new number and resumed texting her. Voges didn't know how he did so because she'd entrusted the new number only to family and coworkers. The next day, the District Attorney sought, and the district court granted, an *ex parte* protective order against Noyes on Voges's behalf. The court also issued a warrant for Noyes's arrest. He posted a bond.

The *ex parte* order barred Noyes from contacting Voges. So Noyes tried to take Voges's deposition testimony as part of the protective-order proceedings. The district court denied that request and held a full hearing to consider a permanent protective order. At the end of that hearing, the district court found reasonable grounds to believe that Noyes had stalked Voges and entered a permanent protective order. That order—which is still in effect—forbids Noyes from contacting, harassing, or threatening Voges, or from going near her home or place of work. Importantly, it also prohibits Noyes from owning a gun for the rest of Voges's life.

Noyes moved for a new trial. He made a variety of arguments, including that his threats are constitutionally protected speech, that he

was denied due process, and that he's entitled to keep his firearms under the Second Amendment and our Constitution's Arms Clause. The district court denied his motion.

Noyes appealed, and the court of appeals affirmed the protective order. That court confirmed that Noyes's persistent threats against Voges constituted sufficient evidence of stalking. As for his constitutional arguments, the court held that his threats aren't protected speech. It didn't consider the due-process claim because Noyes didn't brief it.

Crucially, for present purposes, the court of appeals held that Noyes didn't preserve his challenges to Subchapter A under the Second Amendment and our Arms Clause. It did so in a footnote that puts Reggie Roby to shame:

> In this issue, Noyes also asserts that the lifetime ban on his possession of firearms violates his constitutional right to bear arms, *see* U.S. Const. amend. II; Tex. Const. art. I, § 23, for the reasons explained in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, [597 U.S. 1, 24–25] (2022) (concluding that to uphold firearm regulation, government "must affirmatively prove" that challenged regulation "is consistent with the Nation's historical tradition of firearm regulation"), and *United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir. 2023) (concluding that statute that prohibited possession of firearms by person subject to domestic-violence restraining order failed *Bruen* test and thus violated Second Amendment), *cert. granted*, 143 S. Ct. 2688 (2023). Noyes did not raise this challenge to the constitutionality of the statute in the court below, and he cannot raise it for the first time on appeal. . . . Noyes did argue in the court below that his Second Amendment rights were violated because there was no evidence of gun threats or gun violence presented at trial. However, as we have already explained, the only finding required to issue a protective order under the statute is that "there are

7

reasonable grounds to believe that the applicant is the victim" of an offense such as stalking. Tex. Code Crim. Proc. art. 7B.003(a). The statute does not require evidence of gun threats or gun violence to restrict a person's Second Amendment rights.

*Noyes v. State ex rel. Voges*, No. 03-22-00071-CV, 2023 WL 8102025, at *9 n.4 (Tex. App.—Austin Nov. 22, 2023).

Noyes sought review here in January 2024, about a year before I was honored with a gubernatorial appointment to this Court. We abated his case pending the U.S. Supreme Court's opinion in *Rahimi*, which was handed down five months later. We called for merits briefing in March 2025. Now, with the benefit of petition-stage briefing, merits briefing, and two years to study all the papers, we've learned that Noyes did, in fact, assert his constitutional claims in the district court.[2] Today's GVR sends the case back for consideration of the Second Amendment claim and the Arms Clause claim that the court of appeals tried to punt. *See post* at 5–10 (Hawkins, J., concurring) (unpacking the "GVR" mechanism); *cf.* Josh Blackman, *The Irrepressible Myth of* Cooper v. Aaron, 107 Geo. L.J. 1135, 1194 (2019) (explaining how the U.S. Supreme Court "will grant, vacate, and remand (GVR) in a separate

---

[2] His new-trial motion, for example, argued that "the imposition by the Court of a lifetime ban upon possession of a firearm by [Noyes] is a violation of his 2nd Amendment rights under the US Constitution as well as Art. I, Section 23 of the Texas Constitution." The briefing below might've been better had Noyes (or any of the courts) bothered to serve the requisite notice of his Subchapter A challenge on the Attorney General. *See* Tex. Const. art. V, § 32; Tex. Gov't Code § 402.010(a). The Office of the Solicitor General may wish to weigh in on the constitutional claims Noyes has urged under the Second Amendment and our Arms Clause.

8

order—that is, *grant* the petition, *vacate* the lower court decision, and *remand* for reconsideration"). At long last, therefore, the so-called *real talk* about the right to armed self-defense will begin in earnest.

## II

Were we to take this case now, we'd first have to decide whether Subchapter A authorized the district court's disarmament order. If not, we probably wouldn't need to reach the hard constitutional questions. *See, e.g.*, *Paxton v. Annunciation House, Inc.*, 719 S.W.3d 555, 577 (Tex. 2025). Noyes argues that, according to Section 85.025 of the Texas Family Code, the district court needed to make special findings to issue a protective order lasting more than two years. But I agree with the district court on this point: Subchapter A of Chapter 7B of the Texas Code of Criminal Procedure purports to authorize longer orders—even lifetime disarmament—without those extra findings.

Subchapter A isn't the only provision that authorizes protective orders for victims like Voges. The Family Code does too. But Section 85.025 of that code stops a court from issuing family-violence protective orders lasting more than two years, absent certain findings. *See* Tex. Fam. Code § 85.025(a)–(a-1). Noyes argues that this extra-findings requirement applies with equal force to Subchapter A orders, while the State counters that it applies only to Family Code protective orders.

The State is right. By its own terms, Section 85.025 applies only to "an order under this *subtitle*." *Id.* § 85.025(a) (emphasis added). Subchapter A isn't even in the same code, much less the same subtitle. Other textual features of Section 85.025 reinforce the conclusion that it applies only to Family Code protective orders. Each of the protection-

extending findings requires some showing of past family violence. *See id.* § 85.025(a-1)(1)–(3). Plus, Section 85.025(a) and Article 7B.007(a) of Subchapter A each contain the exact same timing rule that protective orders last for two years unless the order says otherwise. *Id.* § 85.025(a); Tex. Code Crim. Proc. art. 7B.007(a). If Noyes were right that Section 85.025(a)'s two-year limit governs Subchapter A orders, then Article 7B.007(a) would be superfluous. Most importantly, Article 7B.007(a) is explicit that Subchapter A orders may "be effective for the duration of the lives of the offender and victim or for any shorter period stated in the order." Tex. Code Crim. Proc. art. 7B.007(a). So while it's true that Family Code rules apply to Subchapter A orders "except as otherwise provided," *id.* art. 7B.008, the excusable two-year limit in Section 85.025(a) has been overridden by the Legislature, *see id.* art. 7B.007.

## III

That brings us to the bigger question: Does Subchapter A pass constitutional muster? Noyes says it doesn't, at least as applied to him. He argues that his permanent disarmament violates both the Second Amendment and the Texas Constitution's Arms Clause. Though I'm open to contrary arguments rooted in the original public meaning of both constitutional provisions if and when the case returns to this Court, my preliminary view is that, as applied to Noyes, Subchapter A likely violates both provisions.

## A

Turning first to his Second Amendment claim, Noyes raises grave concerns with Subchapter A. He argues that Subchapter A goes too far

10

in authorizing disarmament for as long as both he and Voges are alive, even if he has long since ceased to be a threat to anyone. The State retorts that Subchapter A withstands Noyes's Second Amendment challenge under *Rahimi*.[3]

In *Rahimi*, the U.S. Supreme Court held that the Second Amendment doesn't help a person who's been temporarily disarmed under a protective order if he poses a "credible threat" to the applicant's physical safety. *See* 602 U.S. at 690. To reach that conclusion, the Court applied the text-history-and-tradition framework it previously adopted in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022). That opinion had rejected means-end scrutiny for Second Amendment purposes, even though the Court sometimes uses that framework for other constitutional rights. *Id.* Instead, the Court explained, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* *Bruen* surveyed centuries of Anglo-American legal history and found no tradition supporting broad restrictions on public carry by law-abiding citizens. *Id.* at 38–70.

In *Rahimi*, the Court used the same methodology but came to the opposite conclusion about a facial challenge to a different law, codified at 18 U.S.C. § 922(g). In Section 922(g), Congress prohibited anyone subject to certain domestic-violence restraining orders from possessing

---

[3] The State mistakenly argues that Noyes forfeited his constitutional challenges by failing to preserve them in the district court. Under our generous forfeiture rules, Noyes cleared the low bar for preserving his challenges by asserting in his new-trial motion that the lifetime ban on firearm possession violated his rights under the Second Amendment and our Arms Clause.

a firearm. *See Rahimi*, 602 U.S. at 685 (citing 18 U.S.C. § 922(g)(8)). The Court found that, at the time of the Founding both in England and in America, governments had the power to disarm dangerous people. "Taken together, the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698; *see also id.* at 693–98. "Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be." *Id.* at 698. It's enough that Section 922(g) is "relevantly similar" to historical analogues: The prohibition applies only to "individuals found to threaten the physical safety of another" and is "of limited duration"— one to two years in Zackey Rahimi's case. *Id.* at 698–99.

That brings us back to Noyes and Subchapter A. His case differs from *Rahimi* in two important ways. *First*, the specific provision of Section 922(g)(8) at issue in *Rahimi* requires a finding of dangerousness, while Subchapter A does not. *Id.*; *see also id.* at 693 ("Our analysis starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others. We need not decide whether regulation under Section 922(g)(8)(C)(ii) is also permissible."). *Second*, *Rahimi* dealt with a temporary disarmament of one to two years, while Subchapter A authorizes lifetime disarmament. So while *Rahimi* offers guidance, it doesn't squarely answer the Second Amendment question presented here. To find that answer, we'd need to dig into the historical record and ask whether there's a tradition of laws that, like Subchapter A, allow

12

courts to disarm someone for life without a finding of dangerousness. Spoiler alert: I've found none so far.

**1**

Let's start with English history. In the beginning (for purposes of the Second Amendment), God created the Angles, the Saxons, and the Jutes. The society that these groups eventually forged together relied on a strong militia in lieu of a large standing army. Freemen weren't just allowed but were required to keep arms to defend themselves and others. William S. Fields & David T. Hardy, *The Militia and the Constitution: A Legal History*, 136 Mil. L. Rev. 1, 3 (1992). Freemen "were bound to keep arms for the preservation of the kingdom, their lords, and their own persons" and could "neither pawn nor sell" their arms but rather had to "leave them to descend to their heirs." Nathaniel Bacon, *An Historical and Political Discourse of the Laws and Government of England, from the First Times to the End of the Reign of Queen Elizabeth* 40 (London, 5th ed. 1760) (cleaned up).

That said, the Saxons did impose certain restrictions on arms use—most of which limited sword-drawing. For example, under Saxon rule, drawing a sword while intoxicated was illegal, and so was drawing a sword in the king's hall or in the archbishop's presence. *The Laws of the Earliest English Kings* 21, 69, 73 (F.L. Attenborough ed., 1922). Sword-drawing offenses were generally punishable by fine, *see id.* at 21, 73, except for the offense of drawing a sword in the king's hall, which was punishable by death, *id.* at 69.

Armament mandates continued after the Norman conquest. Henry II's "Assize of Arms" required every freeman to keep weapons

13

based on his wealth. 27 Hen. 2 (1181) (Eng.), *reprinted in* 2 *English Historical Documents* 416–17 (David C. Douglas & George W. Greenaway eds., 1953). And Henry III later expanded that duty to include serfs. Fields & Hardy, *supra*, at 6. Edward I reaffirmed the requirement through the Statute of Winchester. 13 Edw. c. 6 (1285) (Eng.), *reprinted in* 1 *The Statutes of the Realm* 96–98 (London 1810).

Among the required arms was the English longbow, the premier weapon of its time. *Id.* Archers played a key role in English military doctrine, especially in wooded terrain and guerrilla-style engagements. Mathew Strickland & Robert Hardy, *From Hastings to the* Mary Rose*: The Great Warbow* 136–40 (2005). This was especially true during "the wars of Edward III, which led not only to the archer's rising status but [also] to the swelling in numbers of those unemployed soldiers who, during periods of peace, took to the woods with their bows." *Id.* at 141. Many archers also took to the forests during this time to flee corrupt and oppressive laws (perhaps leading to the legend of one resident of Sherwood Forest). *Id.* at 140–43; *see, e.g.*, *Robin Hood: Prince of Thieves* (Warner Bros. 1991). This led England's kings to enact the forest laws, which banned the carrying of weapons, especially longbows, in forests without permission of the king. Strickland & Hardy, *supra*, at 144–45.

"Hunting in all its forms had long been regarded as good training for war . . . ." *Id.* at 143. And under Saxon rule, men could "hunt as they pleased on their own lands provided they respected the king's own woodlands." *Id.* at 144. But the Norman kings monopolized "hunting over extensive areas of the country through the harsh, arbitrary and detested forest law." *Id.* "Designed in principle to protect the king's

14

game by restricting hunting and [deforestation], the forest jurisdiction in addition quickly came to be a lucrative source of crown revenue, with itinerant justices of the forest exacting heavy fines not only for poaching but for taking wood . . . without permission." *Id.* The Normans even expanded the boundaries of royal "forests" to include villages and other areas that were not, in fact, wooded—so that "as much as one-third of England may have fallen within the forest law." *Id.*

Throughout the entire Plantagenet period, Englishmen continued to view the keeping and bearing of arms more as a duty to the Crown than as a personal liberty. For example, when the barons forced King John to sign Magna Carta at Runnymede—after having just fought a civil war against him—they didn't include any mention of an individual right to arms. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 401 (2019).

That allowed England's kings to keep regulating the public carry of weapons. Even as Edward I reaffirmed the duty to keep arms for militia duty, he passed the Statute of Westminster in 1285, which generally prohibited a person from going armed about the City of London after curfew. 13 Edw. c. 1 (1285) (Eng.), *reprinted in* 1 *The Statutes of the Realm*, *supra*, at 102. "By several royal proclamations, [Edward I] also prohibited anyone from going armed within the realm without the king's special license." Michael P. Bitgood, Note, *Still "One Step Too Many": How* Bruen*'s Text-and-History Test Ignores the Plain Text of the Second Amendment*, 1 J.L. Civ. Governance Tex. A&M 329, 340 (2024) (internal quotation marks omitted). From then on,

"proclamations against going armed to prevent possible affrays became quite regular." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 11 (2012).[4]

But by far the most infamous "going armed" law was the Statute of Northampton, enacted in 1328. *Bruen*, 597 U.S. at 40. England at that time was a lawless place. "Bands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders;" and this "spirit of insubordination" had caused a "decay in English national life." Kenneth H. Vickers, *England in the Later Middle Ages* 107 (Charles Oman ed., 1914). And it didn't help that England was corruptly ruled by Queen Isabella, the "She-Wolf of France," who'd taken over as regent after she deposed her husband. *See* Bitgood, *supra*, at 340.[5]

---

[4] According to William Hawkins, going armed had always been an offense at common law. 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (London, Eliz. Nutt 1716). And just before the Glorious Revolution, the King's Bench echoed that notion, explaining that going armed would imply that "the King w[as] not able to or willing to protect his subjects." *Sir John Knight's Case* (1686) 87 Eng. Rep. 75, 76; 3 Mod. 117, 118. But it's unclear whether going armed was actually an offense at common law or whether it had just been banned under statute for so long that, by Hawkins's time, it was treated like common law. *See* Charles, *Faces of the Second Amendment*, *supra*, at 11 (arguing that, "[t]o date, no historian or originalist has provided evidence" that officers of the king had common-law authority to prosecute people for going armed before the Statute of Northampton).

[5] Isabella's deposition is a gripping tale of treason, scandal, and murder. Her husband, Edward II, faced multiple insurrections during his reign. 3 T.F. Tout, *The History of England from the Accession of Henry III to the Death of Edward III* 264–309 (William Hunt & Reginald L. Poole eds., 1905); *see, e.g.*, *The King v. Hugh Le Despencer* (1320) 1 How. St. Tr. 23, 23–38 (Eng.). One of those insurrections was led by Roger Mortimer, who (after being arrested)

Under the Statute of Northampton, men couldn't go armed but "upon pain to forfeit their armour to the king, and their bodies to prison at the king's pleasure." 2 Edw. 3 c. 3 (1328) (Eng.), *reprinted in* 1 *The Statutes of the Realm*, *supra*, at 258 (capitalization omitted). "To enforce the Statute, Edward III ordered sheriffs to investigate the malefactors who ha[d] made assemblies of men-at-arms or ha[d] ridden or gone armed in his bailiwick, contrary to the statute and the king's proclamation." *Range v. Attorney General*, 124 F.4th 218, 238 (3d Cir. 2024) (Matey, J., concurring) (internal quotation marks omitted).

Three facets of the Statute's scope are relevant to our Subchapter A: the locations, the persons, and the arms subject to the Statute. *First*, the Statute limited the location of carrying to one's own house. After all, its blanket rule that a man could not go armed "by night or by day, in fairs, markets, the presence of the justices or other ministers, or any part elsewhere," pretty unambiguously prohibited the public carry of arms. *See* 2 Edw. 3 c. 3 (1328) (Eng.), *reprinted in* 1 *The Statutes of the Realm*, *supra*, at 258 (cleaned up).

*Second*, there's some debate among commentators about whether the Statute applied to all non-noblemen or only to those men thought to

---

escaped to France. *See* 3 Tout, *supra*, at 293. When England and France later went to war, *see id.* at 296, Edward II sent Isabella to France to negotiate a truce with her brother, the king of France. While there, Isabella got into a relationship with Mortimer that was "notorious all over England and France." *Id.* at 298. Together, they raised an army, marched on London, and deposed Edward II. *Id.* at 298–302. They then proclaimed Isabella as regent for her 14-year-old son Edward III, *id.* at 301–04, and "began ruling rather corruptly in the king's name," Bitgood, *supra*, at 340; *see also* 3 Tout, *supra*, at 304–09; *In re Impeachment of Roger Mortimer* (1330) 1 How. St. Tr. 51, 51–54 (Eng.).

be dangerous. Some who take the latter view argue that, because the statute exempted "the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them," *Id.* (capitalization omitted), the only men *not* exempt were those thought to be dangerous, *see* Charles, *Faces of the Second Amendment, supra,* at 26 ("Such persons were exempt because they were presumed to be in no danger of offending the law, or having an intention to commit any act of violence, or disturbing of the peace." (internal quotation marks omitted)). That, of course, would mean that every citizen not actively engaged in the service of the king was presumed to be dangerous, a proposition that would be in some tension with the laws requiring men to keep arms for militia use.

*Third*, though it seems to on its face, the Statute probably didn't apply to all arms. As *Bruen* noted, the Statute "appears to have been centrally concerned with the wearing of armor." 597 U.S. at 41 (collecting sources). To the extent that "armor" included weapons, it covered weapons like lances that were "generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace." *Id.*; *see also* 4 Blackstone, *supra*, at *148 (describing the offense as "going armed with dangerous or unusual weapons" (cleaned up)). And history shows that people continued to carry weapons (especially knives and daggers) for self-defense during this period; that wasn't considered a violation. *Bruen,* 597 U.S. at 41.

As far as modern analogues go, that appears to place handguns outside the Statute's scope. *Id.* at 41–42. When guns first came onto

18

the scene, however, they faced their own set of restrictions.  In 1514, Henry VIII prevailed on Parliament for a statute requiring a license for anyone to own a gun and allowing licenses only for certain noble or wealthy men.  6 Hen. 8 c. 13 (1514) (Eng.), *reprinted in* 3 *The Statutes of the Realm*, *supra*, at 132; *see also* 3 Hen. 8 c. 13 (1511) (Eng.), *reprinted in* 3 *The Statutes of the Realm*, *supra*, at 32–33 (enacting the same requirements for crossbows).[6]  It may be tempting for modern readers to assume that Henry VIII was trying to protect his people from roving bands of harquebusiers.  But that isn't true.  These restrictions were principally motivated by a concern that the people would be distracted from "practicing with long bows, which were considered essential to national defense by the militia."  David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 219 (2018).  The English longbow had remained an important part of national identity since the time of the Normans, and it was credited with English military victories at Crécy and Agincourt.  *See Bruen*, 597 U.S. at 42 (citing R. Payne-Gallwey, *The Crossbow* 32, 34 (1903); L. Schwoerer, *Gun Culture in*

---

[6] Henry VIII firmly enforced these restrictions.  For example, he issued a proclamation instructing "the sheriffs and mayor of London to stop being negligent, slack, or remiss in enforcing the arms restrictions."  David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 782–83 (2014) (internal quotation marks omitted).  And he later "expressed his displeasure and indignation about the unenforcement of arms bans."  *Id.* at 783 (internal quotation marks omitted).

*Early Modern England* 54 (2016)).[7]  Given the immense amount of training required to be competent in longbow usage, Henry VIII also passed a statute requiring fathers to provide their sons with longbows and teach them how to shoot.  6 Hen. 8 c. 2 (1515) (Eng.), *reprinted in* 3 *The Statutes of the Realm*, *supra*, at 123–24.  The bottom line is that Henry VIII suppressed crossbows and firearms in an effort to make his subjects *more* dangerous, not less.

Firearm restrictions continued through the rest of the century.[8] For example, Elizabeth I expanded the Statute of Northampton to prohibit handguns and other concealable weapons.  Patrick J. Charles, *The Fugazi Second Amendment:* Bruen*'s Text, History, and Tradition Problem and How to Fix It*, 71 Clev. St. L. Rev. 623, 632–33 (2023).  Her Privy Council even unsuccessfully "proposed that the government should hold the militia's arms instead of allowing the people to keep them in their homes."  Bitgood, *supra*, at 344.

In the latter half of the seventeenth century, English monarchs "ramped up efforts to disarm their political opponents, an experience

---

[7] The longbow was a formidable weapon—in some ways more formidable than the crossbow and early firearms because it had a greater rate of fire.  But it required significantly more training to use effectively than the crossbow or arquebus did.  *See* Strickland & Hardy, *supra*, at 17.  The longbow was so powerful and difficult to draw that longbowmen had to train from an early age.  *Id.*  The strain of repeated use was so extreme that archers would develop scoliosis.  *Id.*

[8] *E.g.*, 2 & 3 Edw. 6 c. 14 (1548) (Eng.), *reprinted in* 4 *The Statutes of the Realm*, *supra*, at 58 (banning possession of hail shots, which were medieval forms of handheld shotguns, for all but the wealthy and requiring authorized owners to register their hail shots with the government); Statute of Winchester 1603, 1 Jac., c. 25 (Eng.), *reprinted in* 4 *Statutes of the Realm*, *supra*, at 1050 (repealing the militia laws that required men to keep arms).

that 'caused Englishmen . . . to be jealous of their arms.'" *Bruen*, 597 U.S. at 42–43 (quoting *Heller*, 554 U.S. at 593) (alteration in original).[9] To start, Charles II passed the Game Act of 1671, which restricted arms possession to the nobility. 22 & 23 Car. 2 c. 25, § 2 (Eng.), *reprinted in* 5 *The Statutes of the Realm*, *supra*, at 745. Then he revived the Statute of Northampton, which had fallen almost entirely into desuetude, and charged Sir John Knight with violating it because he "did walk about the streets armed with guns, and . . . went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects." *Sir John Knight's Case*, 87 Eng. Rep. at 76; 3 Mod. at 117.

Chief Justice Herbert interpreted the Statute as punishing only "people who go armed to terrify the King's subjects," not anyone who

---

[9] These abuses of power undermined the notion that the king could do no wrong, which was "a necessary and fundamental principle of the English constitution." 3 Blackstone, *supra*, at \*254 (cleaned up). Under that theory, whenever "it happened that, by misinformation or inadvertence, the crown was induced to invade the private rights of any of its subjects," that invasion was "not chargeable personally to the king" but rather to his officers. *Id.* at \*254–55 (cleaned up). To remedy an officer's invasion of a right, the law "furnished the subject with a decent and respectful mode of removing that invasion," namely, "informing the king of the true state of the matter in dispute." *Id.* at \*255. But as George III's refusal to even receive the Continental Congress's petition for relief from the Intolerable Acts might suggest, that remedy tended to work better in theory than in practice. *See* 2 John Adolphus, *The History of England from the Accession of George III to the Conclusion of Peace in One Thousand Seven Hundred and Eighty-Three* 217–18 (London 1802); 1 *Journals of the Continental Congress 1774–1789*, at 115–22 (1904) ("We your majesty[']s faithful subjects . . . beg leave to lay our grievances before the throne. . . . Your royal indignation, we hope, will rather fall on those designing and dangerous men, who [are] daringly interposing themselves between your royal person and your faithful subjects, . . . by abusing your majesty's authority, misrepresenting your American subjects and prosecuting the most desperate and irritating projects of oppression . . . .").

happened to walk about with a weapon. *Id.* That was probably wrong as a textual matter given that the statute didn't have an intent-to-terrorize requirement.[10] But by the time of the Glorious Revolution in 1688, the Statute seems to have come to be understood as containing an implicit intent requirement. *See id.*

Whatever the merits of *Sir John Knight's Case*, what's more important is the reaction it prompted in Parliament. Just three years later, Parliament adopted the "predecessor to our Second Amendment" in the form of the 1689 English Bill of Rights. *Heller*, 554 U.S. at 593. The English Bill of Rights was the first English statute to explicitly recognize a right to keep and bear arms for self-defense. *See Bruen*, 597 U.S. at 44–45. But it was a limited right: It protected only Protestants (not Catholics) and restricted only the Crown (not future Parliaments). 1 W. & M. c. 2 (1689) (Eng.), *reprinted in* 6 *The Statutes of the Realm*, *supra*, at 143. Nevertheless, it "represented a watershed in English history." *Bruen*, 597 U.S. at 44. "Englishmen had never before claimed . . . the right of the individual to arms." *Id.* (alteration in original) (internal quotation marks omitted).

---

[10] It wasn't until 65 years after enactment of the Statute of Northampton that any going-armed law expressly required intent; even then, the offense of intentionally going armed was a separate crime from the regular going-armed offense. Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 Nw. U. L. Rev. 1821, 1831 (2011). And some historical evidence suggests that, throughout the fourteenth century, kings sent reminders "to the different sheriffs that the Statute of Northampton should be strictly enforced as prohibiting the act of 'going armed,' not a particular conduct with the intent to terrify." Charles, *Faces of the Second Amendment*, *supra*, at 13.

Still, the right had big caveats.  For example, the right was only to bear arms "allowed by law" as a "public allowance, under due restrictions, of the natural right of resistance and self-preservation." 1 Blackstone, *supra*, at \*139 (cleaned up).  In other words, the king was free to restrict the right to keep and bear arms, including by banning particular weapons.  And because the Bill of Rights didn't apply to Catholics (or any other non-Protestants), the Protestant monarchs were free to continue disarming them.

Though Blackstone didn't take a position on the intent-to-terrorize requirement, he did believe that going armed violated the public peace by "terrifying the good people of the land."  4 Blackstone, *supra*, at \*148. And Hawkins explained that an innocent intent like self-defense didn't automatically make carrying arms legal:  Under the Statute, a "man cannot excuse the wearing of such armor in public, by alleging that such a one threatened him, and that he wears it for the safety of his person from his assault."  1 Hawkins, *supra*, 136 (cleaned up).  Even so, "no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people." *Id.* (cleaned up).

So it seems that the intent requirement was assessed based not on the offender's intent, but on whether a reasonable observer would infer a dangerous intent from the way the weapon was carried.  This is consistent with Hawkins's view that "persons of quality are in no danger of offending against this statute by wearing common weapons . . . for their ornament or defense, *in such places*, and *upon such occasions*, in which it is the *common fashion* to make use of them." *Id.* (cleaned up)

23

(emphases added). That was because such carrying wouldn't cause "the least suspicion of an intention to commit any act of violence or disturbance of the peace." *Id.* (cleaned up).

The *Bruen* Court found English history "ambiguous at best," and saw "little reason to think that the Framers would have thought it applicable in the New World." 597 U.S. at 39–40. I'd say the same when it comes to statutes like our Subchapter A, because I can discern little evidence that, by the time of the founding, English law would've justified a lifetime ban on firearm possession without any evidence that someone is dangerous. True, English monarchs had sometimes attempted to disarm their political opponents, including Catholics. But even Catholics weren't *entirely* disarmed—they were allowed to keep weapons sufficient "for the defense of their houses or persons." 1 W. & M. c. 15 § 3 (1688) (Eng.), *reprinted in* 6 *The Statutes of the Realm*, *supra*, at 72 (cleaned up). This really amounted to a prohibition on keeping weapons of a quality or quantity more suited to war than self-defense. In contrast, the protective order at issue here completely disarms Noyes. Nor do the forest and game laws provide an adequate analogue. To start, they only disarmed people in forests. True, some kings simply redefined the "forests" to include cities, but even at their most expansive the forest laws still permitted carrying in two-thirds of England. Strickland & Hardy, *supra*, at 144. By contrast, the protective order here disarms Noyes everywhere, forest or not. And while English law sometimes countenanced the disarmament of the people—especially political opponents—the whole point of the Second Amendment was to prevent that from happening again, as the following section will show.

24

**2**

In contrast to England, early America didn't embrace broad disarmament. And for good reason. The Second Amendment was born largely from a rejection of English practices—especially the disarming of political opponents and religious minorities. "Through the[] centuries, English law had disarmed not only brigands and highwaymen but also political opponents and disfavored religious groups. By the time of the founding, however, state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *Rahimi*, 602 U.S. at 694. Here in America, we came to recognize the right to bear arms in much more absolute terms.

That shouldn't come as a surprise. "Our Founders, having witnessed firsthand the indignities and abuses that overeager governments can impose on their own citizens, believed in a citizen's right to bear arms for protection against, among other things, the state itself." Antonin Scalia, American Values and European Values (June 22, 2007), *in Scalia Speaks*, *supra*, at 29, 32. The Revolution started with an attempt by British regulars to disarm the colonists. The British army marched to seize weapons and gunpowder being stored in Lexington and Concord, "confiscat[ing] firearms and gunpowder by conducting house-to-house searches." Kopel, *supra*, at 765–66. American spies had warned the colonists ahead of time, though, and the colonists had moved most of the weapons and gunpowder. In burning the remaining gunpowder at Concord, the British only stoked the fires of independence.

After winning the Revolutionary War, the Founders enshrined in our founding charter the right that they regarded as given by God and defended on the battlefield. At James Madison's urging, our own Bill of Rights expressly guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II; *see* 1 Annals of Cong. 431–32, 436–37 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison). Of course, no "clause in the constitution could by any rule of construction be conceived to give to Congress a power to disarm the people." William Rawle, *A View of the Constitution of the United States of America* 122 (Philadelphia 1825).

The U.S. Supreme Court has described the Second Amendment as having its roots in the English Bill of Rights. *Heller*, 554 U.S. at 593. That's true, but only to a point. The English Bill of Rights was the textual source of many important individual rights in England. Blackstone cited it to explain that the right to keep and bear arms was one of the fundamental rights of Englishmen. *See* 1 Blackstone, *supra*, at *139. But to say that the Second Amendment was "derived from English practice" risks painting an incomplete picture. The Second Amendment was primarily a derogation of English practice. *See* O'Scannlain, *supra*, at 401 ("[A] right to have arms is not among the most ancient in the English tradition."). After all, England continued to disarm its citizens even after the English Bill of Rights was passed, both in the colonies and in the homeland.

The Founders and the ratifying generation viewed this disarmament as a violation, not of some by-the-king's-grace privilege or mere parliamentary promise, but of their natural right to keep and bear

26

arms. As Tucker explained, in England, like "in most governments[,] it has been the study of rulers to confine this right within the narrowest limits possible." 1 Tucker, *supra*, at 300. Even though the English Bill of Rights "seems at first view to counteract" the policy of disarmament, it confined the right to bear arms to Protestants and was interpreted to allow the government to ban "any farmer, or inferior tradesman, or other person not qualified to kill game" from keeping a gun. *Id.* The result was "that not one man in five hundred c[ould] keep a gun in his house without being subject to a penalty." *Id.*

The Founders viewed the pre-Norman era of Saxon rule as an ideal of liberty—not contemporary English law, which honored the right to bear arms mostly in the breach. Kopel, *supra*, at 765–68. Many Founders "believed that the liberties of the Anglo-Saxons had been destroyed by the Norman Conquest in 1066." *Id.* at 767. This so-called "Norman yoke" infringed on "the birthright of the English people." *See* 30 *Wright & Miller's Federal Practice & Procedure* § 6342, at 207 (1997). By characterizing post-Norman laws as "tyranny of an alien King," the Founders could "claim the benefit of those features of the common law favorable to their cause, while ignoring limitations on those rights as Norman importations." *Id.* § 6345, at 461. The consequence is that the Second Amendment was born out of a distinctively American legal revolution.

That revolution wasn't limited to the national constitution. Several state constitutions had already adopted bear-arms provisions. Pennsylvania, North Carolina, Vermont, and Massachusetts expressly

guaranteed the right to bear arms.[11] And Virginia, Delaware, Maryland, New Hampshire, and New York guaranteed the right to a well-regulated militia.[12] These provisions reflect a broad consensus that protecting the keeping and bearing of arms was essential to liberty.

This state-level protection for the right to bear arms continued after the States ratified the U.S. Constitution. "That of the nine state constitutional protections for the right to bear arms enacted immediately after 1789 at least seven unequivocally protected an individual citizen's right to self-defense is strong evidence that that is how the founding generation conceived of the right." *Heller*, 554 U.S. at 603. As Tucker explained, an American man "no more th[ought], of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 Tucker, *supra*, app. at 19.

---

[11] Pa. Const. of 1776, Declaration of Rights, art. XIII ("That the people have a right to bear arms for the defence of themselves and the state . . . ."); N.C. Const. of 1776, Declaration of Rights, art. XVII ("That the people have a right to bear arms, for the defence of the State . . . ."); Vt. Const. of 1777, ch. I, art. XV ("That the people have a right to bear arms for the defence of themselves and the State . . . ."); Mass. Const. pt. 1, art. XVII ("The people have a right to keep and bear arms for the common defence.").

[12] Va. Const. of 1776, Bill of Rights, § 13 ("That a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State . . . ."); Del. Declaration of Rights, § 18 ("That a well regulated militia is the proper, natural and safe defence of a free government."); Md. Const. of 1776, Declaration of Rights, art. XXV ("That a well-regulated militia is the proper and natural defence of a free government."); N.H. Const. pt. 1, art. XXIV ("A well regulated militia is the proper, natural, and sure defence of a state."); N.Y. Const. of 1777, art. XL ("[T]he militia of this State, at all times hereafter, as well in peace as in war, shall be armed and disciplined, and in readiness for service.").

That said, early American law did impose some limits. Many of these restrictions were based on English "going armed" laws—even copying language from the English statutes verbatim. *Bruen*, 597 U.S. at 46 (discussing a Massachusetts law that authorized arrest of "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively . . . by night or by day, in fear or affray of their majesties liege people" (cleaned up)). Because they were based on the Statute of Northampton, they likewise banned not all public carrying of weapons, but only public carrying intended to terrorize. *See id.* at 46, 50.

Early state supreme court opinions confirmed as much. Two cases held that state law prohibited only the carrying of weapons with the intent to terrorize. *State v. Huntly*, 25 N.C. 418, 420–23 (1843); *O'Neil v. State*, 16 Ala. 65, 67 (1849). And the Tennessee Supreme Court reasoned that if the Statute of Northampton was a part of Tennessee law, it would be unconstitutional to the extent it criminalized merely arming oneself. *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

Some States before the Revolution, and more after, banned concealed carry. *Bruen*, 597 U.S. at 47–52. But none banned public carry altogether. The prevailing view was that States could ban concealed carry only if people could carry weapons openly instead. *Id.* at 53. Kentucky was an outlier, insofar as its high court held that banning concealed carry was unconstitutional even if the State allowed open carry. *Id.*

Finally, various States imposed surety statutes that required at-risk individuals to post a bond before they could carry weapons in public.

These laws, like many modern restraining orders, applied only to those who were reasonably likely to cause an injury or breach the peace—such as those who had threatened others with a deadly weapon in the past. *Id.* at 55–56. Even then, the restrained person could continue to carry a weapon if he posted a bond or proved that he needed it for self-defense. *Id.* at 56–57. And while these statutes were on the books in a small number of States, historians have unearthed precious few instances of them ever being enforced. *Id.* at 58.

In all of this history, I see no suitable analogue to Subchapter A. The State relies primarily on the going-armed and surety laws. But those laws are not "relevantly similar." *See Rahimi*, 602 U.S. at 692.

Start with going-armed laws. As noted above, while England sometimes used these laws to disarm groups of political opponents without any showing of dangerousness, that was never permitted here. For example, the Tennessee Supreme Court signaled that it would be unconstitutional to enforce a literal interpretation of the Statute of Northampton—one that prohibited all public carry. *See Simpson*, 13 Tenn. at 359–60. The remaining States with these laws required some proof of an intent to terrorize. *Huntly*, 25 N.C. at 423; *O'Neil*, 16 Ala. at 67. "A by-now-familiar thread runs through these [early] statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. Subchapter A, in contrast, has no dangerousness requirement, so the trial court here didn't make such a finding before disarming Noyes.

One other distinction is worth noting: The *Rahimi* Court noted that Zackey Rahimi's penalty under Section 922(g)(8) was consistent

30

with that of going-armed laws, in part because "temporary disarmament" was a permissible lesser punishment than imprisonment, which likewise results in disarmament. 602 U.S. at 699. But the protective order here isn't temporary; it's permanent. Permanent disarmament outside of prison might be less restrictive than temporary-to-permanent disarmament in prison (depending on the length of the prison sentence). But the Second Amendment requires a "relevantly similar" analogue. *See id.* at 692. A permanent, categorical ban on firearm possession is too much of a stretch to fit within the tradition of going-armed laws as they existed in the States.

Surety laws don't fit for the same two reasons. Surety laws required judicial determinations of individualized dangerousness and were only temporary. *Id.* at 699. Unlike surety laws and Section 922(g)(8), the protective order against Noyes is permanent and was predicated on no such finding.

Moreover, the forest and game laws are an altogether improper analogue given the harsh criticism they received in America. Tucker famously commented that "[w]hoever examines the forest, and game laws in the British code, will readily perceive that the right of keeping arms is effectually taken away from the people of England." 2 Tucker, *supra*, at *144 n.41. And Rawle stated that the "arbitrary code for the preservation of game in [England] has long disgraced" the freedoms of which England boasted. Rawle, *supra*, at 122. Even Blackstone, an avowed monarchist, observed that "the prevention of popular insurrections and resistance to government by disarming the people, is

31

oftener meant than avowed by the makers of forest and game laws." *Id.* at 122–23 (citing 2 Blackstone, *supra*, at \*412).

The militia laws don't work either.[13]  A well-regulated—that is, an orderly—militia is "necessary to the security of a free State."  U.S. Const. amend. II.  "Although in actual war the service of regular troops are confessedly more valuable [than the service of the militia], yet while peace prevails, and in the commencement of a war before a regular force can be raised, the militia form the palladium of the country."  Rawle, *supra*, at 121.  So the "duty of the state government is to adopt such regulations as will tend to make good soldiers."  *Id.* at 122.

England recognized this principle too.  The Anglo-Saxons relied almost exclusively on the militia for their national defense.  Fields & Hardy, *supra*, at 3.  And for the first several hundred years of England's history, kings required freemen to keep certain weapons for use in the militia.  *E.g.*, 13 Edw. c. 6 (1285) (Eng.), *reprinted in* 1 *The Statutes of the Realm*, *supra*, at 96–98.  It wasn't until the seventeenth century that kings began disarming the militia.  For example, under James I, Parliament repealed many militia laws and centralized arms possession.  Statute of Winchester 1603, 1 Jac., c. 25 (Eng.), *reprinted in*

---

[13] The State also argues that the protective order here fits within the tradition of disarming mentally ill individuals.  No doubt that such a historical tradition exists, but the argument fails for two reasons.  *First*, mental illness isn't a ground for the protective order against Noyes, and likely couldn't have been, since it's not a ground that Subchapter A recognizes.  *Second*, the record contains no evidence that Noyes has been diagnosed as mentally ill, and the State points only to "[Noyes's] 'crazy' behavior [as] support[ing] an implied finding that [Noyes] was 'mentally ill.'"  That's not enough to justify disarming him under any law of which I'm aware.

4 *The Statutes of the Realm*, *supra*, at 1050. His successors continued that practice throughout the rest of the century by selectively disarming members of the militia thought to be loyal to their political opponents. O'Scannlain, *supra*, at 401.

That doesn't support a complete and permanent ban on firearm possession. But it also doesn't help Noyes. Participating in the militia (and the accompanying requirement to keep arms) was a duty, not a right. It's unclear whether Noyes is a member of the "militia," within the original public meaning of that term, given that the protective order and his criminal record may impact his eligibility for military service.

\*　　\*　　\*

In sum, it seems to me that Subchapter A lacks a historical analogue sufficient to uphold its permanent-disarmament orders. Although I remain open to other historical-analogue arguments that the State or amici may present in the future, Subchapter A appears to violate the Second Amendment in at least some applications.

**B**

Even if Subchapter A passes Second Amendment muster, though, that's far from the end of the matter. After all, Texas has its own Constitution, which may provide different or greater protections. *See Tex. Dep't State Health Servs. v. Crown Distrib. LLC*, 647 S.W.3d 648, 664–81 (Tex. 2022) (Young, J., concurring). There's good reason to think it does.

The Arms Clause of the Texas Constitution guarantees as follows:

> Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State; but the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime.

33

Tex. Const. art. I, § 23; *see also id.* art. I, § 29 ("To guard against transgressions of the high powers herein delegated, we declare that every thing in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void."). Although at face value the phrases "in lawful defence" and "regulate the wearing of arms, with a view to prevent crime" may appear to narrow the right, that reading is inconsistent with the original public meaning of the Arms Clause. Indeed, we've long held that the right to bear arms is absolute within its scope, so defining the scope is the ultimate question.

**1**

Texans have enjoyed a right to bear arms since the founding of the Republic of Texas. Some stereotypes are true: "The people of Texas are now, and ever have been, emphatically an armed population." *Choate v. Redding*, 18 Tex. 579, 581 (1857) (Hemphill, C.J.); *see also* James W. Paulsen, *A Short History of the Supreme Court of the Republic of Texas*, 65 Tex. L. Rev. 237, 255 (1986) (recounting then-Judge Hemphill's use of his bowie knife to disembowel a courtroom assailant).

Texas, like the United States, was founded in a war with an enemy that sought to disarm and disable her. General Antonio Lopez de Santa Anna was a dictator who repealed the Mexican Constitution and "centralized the government, converting what had been states into mere provinces." William J. Chriss, *Six Constitutions Over Texas* 16 (2024). When it became clear that Santa Anna had fallen into full-blown despotism, "war and independence became the only alternative." *Id.* at 24. That wasn't just true for Texas, as Santa Anna's usurpation sparked

revolts throughout Mexico. *See* Hubert Howe Bancroft, *History of the North Mexican States and Texas: Vol. II 1801–1889, reprinted in* 16 *The Works of Hubert Howe Bancroft* 152–53 (San Francisco, History Co. 1889). Santa Anna defeated those loyal to the Mexican Constitution of 1824 and the republican principles it embodied. *Id.* But not Texas. When Santa Anna's army demanded that the people of Gonzales surrender their cannon, they declined. Stephen L. Hardin, *Battle of Gonzalez, in* 3 *The New Handbook of Texas* 228, 228 (Ron Tyler et al. eds., 1996). As a symbol of defiance, Caroline Zumwalt and Eveline DeWitt made a flag with the phrase "come and take it" stitched next to an image of their town's cannon. *See also* Thomas Ricks Lindley, *Gonzalez "Come and Take It" Cannon, in* 3 *The New Handbook of Texas*, *supra*, at 230, 230. That flag became a symbol of the Texas Revolution:



COME AND TAKE IT

Texas then declared independence from Mexico and set up a new government before defeating Santa Anna's forces at the Battle of San Jacinto shortly thereafter.[14]

One of the chief grievances in Texas's Declaration of Independence was that the Mexican government, under Santa Anna, had "demanded us to deliver up our arms, which are essential to our defence—the rightful property of freemen—and formidable only to tyrannical governments." The Declaration of Independence (Repub. Tex. 1836), at 5, *reprinted in* 1 Gammel, *supra*, at 1063, 1065). And when this and other grievances "reached that point at which forbearance ceases to be a virtue," the People of Texas "took up arms in defence of the national constitution." *Id.* at 6.

The Declaration's promise was met in the Republic's Constitution of 1836, which guaranteed that "[e]very citizen shall have the right to bear arms in defence of himself and the republic." Repub. Tex. Const. of 1836, Declaration of Rights, cl. 14, *reprinted in* 1 Gammel, *supra*, at 1069, 1084. Partly because of the "realities of country life," the Republic of Texas guaranteed "a right to weaponry beyond that found in the

_____

[14] Texas's Declaration of Independence relied on principles of inalienable liberties and reasserted the right to dispense with tyranny, but it did so "in terms somewhat different from the American Declaration from which Texas's was obviously adapted." Chriss, *supra*, at 25. "As [Texas] saw it, this was not the mere severance of connections between a metropolis and a peripheral area in the way Jefferson had put the matter to Britian and the world sixty years before. Rather this was a real Hobbesian/Lockean state of chaos that demanded immediate action because . . . 'the first law of nature, the right of self-preservation . . . [obligated them] to abolish such government.'" *Id.* (quoting The Declaration of Independence (Repub. Tex. 1836), at 4, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas 1822–1897*, at 1063, 1064 (Austin, Gammel Book Co. 1898).

Second Amendment." Chriss, *supra*, at 31. And unlike many federal constitutional rights, which can seemingly be overcome by necessity, real or perceived, the Constitution of 1836 made its rights absolute, declaring that they "shall never be violated on any pretence whatever." Repub. Tex. Const. of 1836, Declaration of Rights pmbl., *reprinted in* 1 Gammel, *supra*, at 1082. So the result was that the Texas Constitution's right to bear arms was "significantly broader than [its] US counterpart[]." Chriss, *supra*, at 31. In interpreting this same language from the Arms Clause, this time under the Constitution of 1845, we confirmed that the "right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute." *Cockrum v. State*, 24 Tex. 394, 401 (1859).

Texas's militia immediately put the right to bear arms to work. In 1836, the First Congress of the Republic of Texas passed a law requiring then-President Sam Houston to raise "a battalion of mounted riflemen . . . for the protection of the frontier." Act approved Dec. 5, 1836, 1st Cong., R.S., § 1, 1836 Repub. Tex. Laws 53, 53, *reprinted in* 1 Gammel, *supra*, at 1113, 1113. And the First Congress paid for each rifleman "to furnish himself with a suitable, serviceable horse, a good rifle, and one brace of pistols." *Id.* § 2; *see id.* § 3.

The very next law that the First Congress passed enrolled most men into the militia and required each man to furnish himself with either "a good musket, a sufficient bayonet and belt, six flints, knapsack and cartridge box, with twenty-four suitable ball cartridges" or "a good rifle, yauger, or shot gun, knapsack, shot pouch, powder horn, fifty balls suitable to the calibre of his gun, and a half pound of powder." Act approved Dec. 6, 1836, 1st Cong., R.S., § 1, 1836 Repub. Tex. Laws 54,

37

54–55, *reprinted in* 1 Gammel, *supra*, at 1114, 1114–15. That law also exempted any arms and ammo belonging to militiamen "from all suits, seizures, or sales." *Id.* So by the end of the First Congress, Texas had expanded its absolute right to keep and bear arms: Not only could the government not seize your arms, but now your neighbor couldn't sue you for them either.

Like many other laws, Texas's right to bear arms changed following the Civil War. As a condition for readmission to the Union, Texas had to adopt a new constitution—after all, we couldn't have Texas officials swearing loyalty to the Confederacy and touting a pretended "right" to keep slaves. *See* Tex. Const. of 1861, art. VII, § 1; *id.* art. VIII. Texas's first attempt at a rewrite was the Constitution of 1866. Although then-President Andrew Johnson accepted that iteration as satisfying Texas's readmission requirements, the federal Congress rejected it. *See* Chriss, *supra*, at 105. Instead, Congress passed the First Reconstruction Act, which put Texas under martial law until it ratified both the Fourteenth Amendment and a new constitution. *Id.* at 106.

Texas complied with Congress's demands and ratified the Constitution of 1869, which differed significantly from Texas's prior constitutions. Carl H. Moneyhon, *Reconstruction*, *in* 5 *The New Handbook of Texas*, *supra*, at 474, 477. Relevant here, the new constitution narrowed the scope of the right to keep and bear arms. The new version of the Arms Clause provided that "[e]very person shall have the right to keep and bear arms, in the lawful defence of himself or the State, *under such regulations as the Legislature may prescribe.*" Tex. Const. of 1869, art. I, § 13 (emphasis added).

The Constitution of 1869 satisfied Congress, which readmitted Texas to the Union in 1870, but nearly everyone in the Lone Star State was unhappy with it. *See* Janice C. May, *The Texas State Constitution: A Reference Guide* 10–13 (1996); Josh Morrow, *There Is Only One Texas Constitution*, 52 St. Mary's L.J. 765, 775 (2021). Although the cause of this discontent has "been the subject of sustained historical debate," Morrow, *supra*, at 775 n.50, what's important is that Texas promptly called another constitutional convention, which resulted in the Constitution of 1876.

The Constitution of 1876 came with another change to the Arms Clause, which was rewritten to read as it does to this day: "Every citizen shall have the right to keep and bear arms in the lawful defence of himself or the State; but the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime." Tex. Const. art. I, § 23. In so doing, the People restricted the Legislature's general power to "prescribe" "regulations" about the keeping and bearing of arms, instead limiting that power to "regulat[ing] the wearing of arms" to "prevent crime." By narrowing the circa-1869 limitation, in other words, the Constitution of 1876 expanded the scope of the right.

For that reason, those who cite *English v. State*, 35 Tex. 473 (1871), or *State v. Duke*, 42 Tex. 455 (1875), for the notion that the federal and state constitutions don't protect public carry for self-defense are wrong.[15] *First*, *English* and *Duke* were decided under the short-lived

_____

[15] For example, the State of New York wrongly relied on *English* to defend its public-carry ban in *Bruen*, Brief for Respondents at 28, 39, 597 U.S.

39

Constitution of 1869, which gave the Legislature a broad and unqualified power to regulate the keeping and bearing of arms—a power that the People of Texas have since curtailed. *Second*, any reliance on those cases ignores our decision in *Cockrum*, which recognized the "absolute" right of armed self-defense for law-abiding citizens—though not for homicidal horse thieves. 24 Tex. at 401. *Cockrum*, which was decided under the unlimited language of the Constitution of 1845, says far more about how early Texans saw their rights than *English* or *Duke*. That's important because the Constitution of 1876 returned the right to something resembling its original scope.

**2**

Within this historical context, the two phrases that might seem to constrict the Arms Clause may not render the right all that narrow.

Start with the phrase "in the lawful defence of himself or the State." Recall that the right to bear arms under the Constitutions of 1836 and 1845 was absolute. That was true even though the Constitution of 1836 used the phrase "in defence of himself and the republic," Repub. Tex. Const. of 1836, Declaration of Rights, cl. 14, *reprinted in* 1 Gammel, *supra*, at 1069, 1084, and the Constitution of 1845 used the almost identical phrase "in the lawful defence of himself and the State," Tex. Const. of 1845, art. I, § 13. In the absence of evidence that the original public meaning of that phrase changed from

---

1, and the State of New Jersey recently made the same mistake in defending its "sensitive places" statute in *Koons v. Attorney General*, Opening Brief of Defendants-Appellants at 14–16, 156 F.4th 210 (3d Cir. 2025).

40

1845 to 1876, that phrase doesn't limit the scope of the right now any more than it did back then.

Of course, the absolute nature of the right to bear arms isn't an excuse to commit or aid crimes. Even in Texas's early days, if you used weapons as a part of a crime, you would be subject to an enhanced penalty. *E.g.*, 1856 Tex. Penal Code arts. 325–26. If you gave someone else weapons to help him commit a crime, you would be liable as an accomplice. *Id.* arts. 216, 219, 321. And if there was an allegation that your weapons were stolen or evidence of an insurrection, a court could issue a search warrant requiring them to be brought before the court for inspection. 1856 Tex. Code Crim. Proc. arts. 301(1), (4)–(5).

This understanding fits squarely within the phrase "in the *lawful* defence." Tex. Const. of 1845, art. I, § 13 (emphasis added). In interpreting an 1856 statute that enhanced sentences for homicides committed with bowie knives, we acknowledged the constitutional "right to carry a bowie-knife for lawful defense." *Cockrum*, 24 Tex. at 402.[16] But we held that the Legislature could still "affix a punishment to the abuse of this right," so long as it wasn't so severe as to "deter the citizen from its lawful exercise."

---

[16] The dangerousness of the arm doesn't affect whether the right is itself absolute within its proper scope. As we explained in *Cockrum*: "[A bowie-knife] is an exceeding[ly] destructive weapon. . . . The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defense, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon." 24 Tex. at 402–03.

*Id.* at 403. That caveat is important. The right to keep and bear an arm implies the right, in a proper emergency, to use it. *Id.* at 402–03. So any statute requiring a person to wear a weapon in a manner rendering it useless for self-defense would be clearly unconstitutional. *Id.* So, for example, even though gutting a man with a bowie knife over an insult doesn't qualify as "lawful defence," a statute prohibiting the use of a bowie knife altogether would likely go too far. *See id.*

Now for the phrase, "the Legislature shall have power, by law, to regulate the wearing of arms, with a view to prevent crime." Three points bear emphasis. *First*, "regulate" doesn't mean "prohibit." Indeed, the delegates to the Constitutional Convention of 1875 chose not to adopt an amendment to the Clause that would've allowed the Legislature to "prohibit" the wearing of arms. *Debates in the Texas Constitutional Convention of 1875*, at 294 (Seth Shepard McKay ed., 1930).

And we know that the scope of the limitation is narrower—such that the scope of the right is broader—than it was under the Constitution of 1869. So the Arms Clause can't encompass some free-roaming legislative power to restrict rights. Even if that conclusion weren't obvious from the textual history of the Arms Clause, it'd still follow from the Clause's historical context. After all, Santa Anna tried to assert such a free-roaming power to disarm Texans, and it didn't go well for him. Texas chose to fight a revolution rather than surrender her arms.

*Second*, the provision limiting regulatory power to "wearing" an arm presumptively deprives the government of the power to regulate other arms-related acts. The negative-implication canon directs us to a reading under which the inclusion of the word "wearing" reasonably

42

implies the exclusion of all other things one might do with an arm. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11 (2012). And because we "avoid interpreting words in a way that renders them pointless," it would be (at best) odd to interpret "wearing" an arm to mean the same thing as "keep[ing] and bear[ing]" an arm. *Id.* at 175. After all, it's no more our "function to revise by subtraction than by addition." *Id.* at 174. Words often have overlapping meanings, particularly those in lists, but we try to read them as having "some independent operation." *Id.*

Here, dictionaries contemporaneous with the adoption of the Constitution indicate that the ordinary public meaning of "wearing" an arm had some overlap with "bearing" an arm and perhaps also with "keeping" an arm. But at minimum, "wearing" surely covered a narrower set of acts than "keeping" or "bearing" did. *See State v. Villanueva*, 686 S.W.3d 752, 758 (Tex. Crim. App. 2024) (Slaughter, J., dissenting from refusal of petition for discretionary review).

According to the 1886 edition of *Webster's Dictionary*, "keep" meant to have "custody; guard; care [or] heed." *Keep, Webster's Complete Dictionary of the English Language* (Chauncey A. Goodrich et al. eds., London, George Bell & Sons 1886). This was consistent with the 1882 version of Samuel Johnson's Dictionary, which defined "keep" as "[r]etain; not lose" or "[h]old in custody; have in custody." *Keep, A Dictionary of the English Language* (Robert Gordon Latham ed., London 1882).

*Webster's* defined "bear" as "possess or carry" or "wear; as, to bear a sword, badge, or name." *Bear, Webster's Complete Dictionary, supra*

(emphasis omitted). And *Johnson's* defined it simply as "[c]arry." *Bear*, *A Dictionary of the English Language, supra.*

"Wear" appears to have been a subset of "bear." According to *Webster's*, "wear" meant "carry or bear upon the person . . . as an article of clothing, decoration, warfare, or the like; to have appendant to one's body . . . ; to wear a sword." *Wear, Webster's Complete Dictionary, supra* (emphasis omitted). And according to *Johnson's*, "wear" meant to "[c]arry appendant to the body." *Wear, A Dictionary of the English Language, supra.*

Although the People's choice to use both "wear" and "bear" in the same constitutional provision may make them appear redundant, we can comfortably read them with "independent operation[s]." *See* Scalia & Garner, *supra*, at 176. That's because the grant of power to the Legislature as to the "wearing" of arms is a carveout from the People's general right. In other words, the People have a right to "bear"—that is, to "possess or carry"—arms except where the Legislature regulates the "wearing"—that is, the carrying upon one's body—of arms. There may well be additional historical explanations for these textual choices, too. In any event, absent evidence that's thus far wholly lacking, "wearing" arms is far narrower than, and thus independently operable from, "keeping" arms.

Thus, the original public meaning of the right to "bear" arms would've encompassed, at minimum, "both the carrying of weapons 'on' the person's body, such as carrying arms in an open hand or holstered on a belt, as well as possession 'about' the person's body, such as transporting arms in a lock box on a stagecoach." *Villanueva*, 686

44

S.W.3d at 758 (Slaughter, J., dissenting from refusal of petition for discretionary review). But the Legislature's prerogative to regulate the "wearing" of arms would've been limited to the carrying of weapons "on" the person. *Id.* It wouldn't have extended to regulating even the carrying of arms "about" the person because a "person who carried weapons in a lock box on a stagecoach," for example, wouldn't have been "said to have 'worn' arms." *Id.*

As a result, it's very possible that the Texas Constitution only allows the Legislature to regulate the carrying of arms on the person and not the possessing, conveying, or storing of arms. If that's correct, then, under a strict-scrutiny framework, the Legislature could only regulate the possession, conveyance, or storing of arms if the right could be overcome by a compelling government interest. But if, as I suspect, the right is absolute, it can go no further than restricting the "wearing" of arms.[17]

*Third*, it's unclear what standard we should apply to determine whether a regulation was enacted "with a view to prevent crime." On the one hand, the phrase "a view to prevent crime" could mean that we must strictly scrutinize laws regulating the wearing of arms—as we do with other fundamental rights—to determine whether they're narrowly tailored to the government's interest in preventing crime. On the other hand, the phrase could mean that we must defer to the Legislature's

---

[17] Given that the tiers of scrutiny didn't appear in federal jurisprudence until the 1930s, it's doubtful that Texans understood their rights to be subject to that framework, let alone to rational-basis review, when they adopted their constitution in 1876. *See generally United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 & n.4 (1938) (describing tiers of judicial scrutiny).

policy judgments as long as the Legislature has a rational basis for believing that its statutes will prevent crime. On the latter view, the phrase would mean something similar to the term "necessary and proper" in the U.S. Constitution: something convenient or useful—or even something that *could be* convenient or useful—for preventing crime. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 418 (1819); U.S. Const. art. I, § 8.

\* \* \*

The right to keep and bear arms under our Constitutions of 1836 and 1845 was absolute within its scope. We presume the Legislature is aware of our opinions when it enacts laws or proposes constitutional amendments. Similarly, we must assume that the People acted intentionally when they chose to reinstate language we previously said created an absolute right. In short, the Texas Constitution probably confers an absolute right to keep and bear arms, with the limited exception that the Legislature can regulate the wearing of arms to prevent crime.[18] So the protective order here, with its blanket ban on firearm possession at any time in Voges's life, is hard to square with our Arms Clause.

---

[18] The notion of absolute constitutional rights isn't an antiquated one. Just last year, we held that the Texas Constitution's Religious Services Clause "is absolute and categorical, meaning it forbids governmental prohibitions and limitations on religious services regardless of the government's interest in that limitation or how tailored the limitation is to that interest." *Perez v. City of San Antonio*, 715 S.W.3d 709, 730 (Tex. 2025).

## IV

The record makes clear that Jonathan Noyes grievously wronged Samantha Voges. Nobody deserves such abuse. Noyes will remain subject to the district court's permanent protective order as this case proceeds on remand. That means he'll still be forbidden to contact Voges, forbidden to harass or threaten her, forbidden to go near her home or place of work. It also means Noyes cannot lawfully own a firearm as long as our judicial system continues to evaluate his constitutional claims.

Though I haven't undertaken an exhaustive historical study of the scope of gun rights under the federal or state constitutions, I hope that the lower courts, counsel, amici, and scholars will try to do so. But it's been about a century since this Court has explained what protections our federal and state constitutions afford to those who wish to exercise their long-standing and hard-fought right to keep and bear arms. The People of Texas shouldn't have to endure another hundred years of silence from this Court about the contours of this cornerstone right. Texans deserve clarity—not just from Washington but from Austin too.

James P. Sullivan
Justice

**OPINION FILED:** _____

47